Filed 5/3/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B262627 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA075002) |
| v. | |
| EHAB ALY MOHAMED, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael V. Jesic, Judge. Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant Ehab A. Mohamed.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven E. Mercer, Deputy Attorney General, and Michael R. Johnsen, Supervising Deputy Attorney General, for Plaintiff and Respondent.

_____

Ehab Aly Mohamed appeals from the judgment entered following a jury trial in which he was convicted of involuntary manslaughter in violation of Penal Code section 192, subdivision (b) (count 1), and elder abuse in violation of section 368 (count 2).[1]  As to count 1, the jury found true a great bodily injury allegation pursuant to section 1192.7, subdivision (c)(8).[2]  The court sentenced appellant to a total term of five years in state prison, consisting of the upper term of four years on count 1, plus one year on count 2.

Appellant contends (1) the evidence based on an accomplice's uncorroborated testimony was insufficient to support appellant's conviction for involuntary manslaughter; (2) the trial court prejudicially erred in failing to instruct on principles of accomplice corroboration; and (3) the great bodily injury finding with regard to count 1 must be stricken because a great bodily injury enhancement cannot attach to a conviction for manslaughter.  We disagree and affirm.

## FACTUAL BACKGROUND

In 2010, appellant was a board certified gynecologist who practiced cosmetic surgery out of his Encino office.  Appellant relied on "cutting edge" technology in his practice and used a medical instrument called a "VASER" liposuction machine in his liposuction procedures.  The VASER liposuction performed by appellant involves a three-step process:  first, a solution of saline, epinephrine (a blood vessel constrictor), and lidocaine (a local anesthetic) is injected or "infiltrated" under the skin; next, a titanium probe is inserted under the skin to deliver ultrasound energy through the VASER amplifier to loosen the fat cells; and finally, the injected solution along with the loosened fat cells are sucked out, or "aspirated" from the body, resulting in a liquid aspirate consisting of infiltrated solution, blood, and fat.

---

[1] Undesignated statutory references are to the Penal Code.

[2] The jury found not true the great bodily injury allegation as to count 2. (§ 12022.7, subd. (c).)

2

Appellant performed his liposuction procedures in a room in his medical office, which was not an accredited surgical center. The office lacked an electrocardiogram (EKG) machine, pulse oximeter, backup oxygen, a backup power supply, and a "crash cart," and had only a limited supply of drugs to reverse the effects of narcotics. Appellant did not employ any certified advanced cardiac life support personnel, nor did he have an anesthesiologist or a nurse anesthetist to handle sedation during his surgeries. On occasion, appellant's office assistant, Judy Evans, assisted him in his procedures. Hired in 2001, Evans did everything in the office from performing general office work to assisting in appellant's surgeries and procedures. Evans received lip and facial injections from appellant at cost. She had attended one year of nursing school about 40 years earlier, but was not licensed as a nurse. As of 2011 she had not taken a CPR class in eight years.

### Zackie Handy

Zackie Handy went to see appellant in May 2010 about a treatment to reduce the wrinkles on her face. She was 77 years old. Appellant convinced her to undergo liposuction to remove fat from her abdomen, back, under her arms, and her legs, claiming the treatment was "tax deductible" and would reduce the risk of heart attack and Alzheimer's, lower her cholesterol "by a lot," and add 20 years to her life. He assured her she would have "no downtime." Appellant also told Handy she would be part of a "Harvard study" and would receive a substantial discount. Handy agreed to the liposuction procedure on her abdomen, and paid appellant with a $55,000 cashier's check from her equity line. She subsequently gave appellant two more postdated checks totaling $45,000.

When Handy arrived for the procedure on her abdomen, she told "Nurse Judy" she had taken baby aspirin that day. Evans said that would be fine and gave Handy four Vicodin pills (a combination of acetaminophen and the opioid hydrocodone) and 1.5 milligrams of Xanax (an anti-anxiety drug) to take orally. Handy told appellant not to do anything to her face. Handy fell asleep during the procedure and woke to find her face blotchy and lumpy from fillers appellant had injected into her lip, chin, eyelids, and

eyebrows. Appellant told her that he had been forced to stop the liposuction because of excessive bleeding due to the aspirin and had worked on her face instead.

Unhappy about the fillers, Handy nevertheless returned to appellant for the liposuction two days later. This time, she was given seven Vicodin pills and a half-milligram of Xanax. Again she fell asleep. According to appellant's record of Handy's liposuction procedure on May 21, 2010, he removed 7,600 cubic centimeters (cc's) of aspirate from Handy's body.

During a follow-up appointment, Handy complained about the appearance and pain from the lumps on her face. Appellant gave her a "free" Botox injection, which she did not want. As a result of the injection, Handy could not close one eye, and she continued to experience pain and headaches from the fillers. Handy canceled further appointments with appellant, stopped payment on the two postdated checks she had given him, and reported him to the California Medical Board.

### Sharon Carpenter

On August 17, 2010, Sharon Carpenter consulted with appellant about having "whole body" liposuction. She was 61 years old. Appellant told her that he performed a unique form of liposuction, and she would receive a discount by being part of a "Harvard study." Carpenter was eager to have the procedure and agreed to pay appellant's $100,000 fee.

Carpenter returned to appellant's office with her husband for the liposuction on August 21, 2010. They arrived approximately 9:00 a.m., but appellant was not there yet. After speaking with appellant on the phone, Evans applied a fentanyl patch (a transdermal opioid) to Carpenter's neck.[3] Carpenter took Vicodin and 0.5 milligrams of Xanax given to her at 10:47 a.m.

---

[3] The fentanyl patch was Evans's own prescription which she had brought to the office from home. Appellant had prescribed it to her for pain following her own liposuction procedure in June 2010.

Appellant started Carpenter's liposuction procedure assisted by Evans at 1:10 p.m. by placing 12 skin ports on Carpenter's body. At 2:30 p.m. appellant began infiltration of approximately 5,000 cc's of a normal saline solution containing 1 percent lidocaine and one part per million epinephrine. Carpenter received another milligram of Xanax at 2:35 p.m., and appellant started using the VASER at 3:35 p.m. Appellant gave Carpenter oral doses of Percocet (a combination of acetaminophen and the opioid oxycodone) at 4:45 p.m. and again at 7:00 p.m. Carpenter received an injection of Zofran (an anti-nausea medication) at 2:45 p.m. and another after she vomited, about nine hours into the procedure. The fentanyl patch was removed at 10:00 p.m.

In lieu of electronic monitoring, appellant and Evans manually monitored Carpenter's vital signs throughout the 11-hour procedure. Appellant or Evans took Carpenter's pulse by hand, both watched her breathing for changes, and appellant monitored her oxygenation and consciousness by maintaining conversation with her throughout the procedure. Carpenter did not receive intravenous fluids, but drank water and other liquids during the surgery. Appellant and Evans estimated she drank about three and a half liters. During the procedure, Carpenter urinated into a bedpan, and Evans "eyeballed" the volume of urine.

At approximately 11:30 p.m. Carpenter refused to take any more fluids, and appeared dehydrated. Appellant twice called Encino Hospital across the street seeking to borrow or purchase IV tubing, normal saline bags, and an 18-gauge cannula. According to the nursing supervisor who spoke with him, his voice sounded urgent. The hospital refused to give appellant any medical supplies.

After calling the hospital, appellant resumed the liposuction. Carpenter became sleepy and appellant assured her the procedure would only be 15 minutes longer. But appellant continued the liposuction for another 30 to 40 minutes, reaching a total of 5,000 cc's of extracted aspirate. At 12:17 a.m.—11 hours into the procedure—appellant noticed that Carpenter's breathing was shallow, and she was unresponsive. He also noticed her lips were slightly cyanotic (blue), which meant that she was not getting sufficient oxygen. As appellant began rescue efforts, Evans called 911. At 12:25 a.m.

5

appellant lost Carpenter's pulse, and appellant and Evans moved her to the floor to perform CPR.

Paramedics arrived at the building at 12:22 a.m., but the door was locked, delaying their entry. When they reached appellant's medical office on the seventh floor, they found appellant performing CPR, and blood was everywhere. Carpenter had no pulse and was not breathing; the paramedics took over CPR, started epinephrine, and gave her atropine, to no effect. Twenty minutes later Carpenter was pronounced dead.

Los Angeles County Coroner's investigator Betsy Magdaleno arrived at appellant's office at 2:40 a.m. and interviewed appellant after he had finished writing his notes. The only medical equipment she saw in the procedure room was a stethoscope. She observed no patient monitoring devices: No EKG monitor, no pulse oximeter, no oxygen tanks, no "crash cart." She saw six 1,000 cc canisters containing aspirate in the room. Four were overturned on the floor, one was on a table, and one was still hooked up to the liposuction machine.

### Expert Opinion

Dr. Raffi Djabourian, the Senior Deputy Medical Examiner for the Los Angeles County Coroner, conducted an autopsy of Sharon Carpenter on August 23, 2010. Based on toxicology tests on blood and tissue samples, he concluded that the cause of death was opioid toxicity from the lidocaine, fentanyl and oxycodone she had received. Dr. Djabourian explained that a drug overdose resulting from the combination of these drugs could have caused death in several different ways: by depressing breathing, causing an abnormal heart rhythm, or depressing or overactivating brain function causing seizure. He further opined that undiagnosed artherosclerosis (blockage of the coronary arteries) made her particularly vulnerable to a drug overdose and was a contributing factor in Carpenter's death.

Other experts who reviewed appellant's records in the case and consulted with the coroner opined that the drug administration and monitoring procedures employed by appellant during Carpenter's liposuction constituted "extreme negligence," a "terrible departure from the standard of care," medical negligence, involved numerous "extreme

departures from the standard of care, and violated California regulations governing liposuction procedures as well as guidelines promulgated by the American Society of Anesthesiologists. (Cal. Code Regs., tit. 16, § 1356.6.) Specifically, these experts found that appellant committed multiple violations of the standards of reasonable medical care by: subjecting Carpenter to nearly 12 hours of surgery without cardiac monitoring and without IV fluid administration or IV access in a non-accredited facility;[4] failing to properly monitor and replace the volume of fluid removed from Carpenter's body; attempting to monitor Carpenter's vitals while simultaneously performing surgery; failing to have available during the surgical procedure basic monitoring and safety equipment such as a pulse oximeter, EKG machine, and crash cart; orally administering a combination of opioids during surgery; authorizing administration of a fentanyl patch for a liposuction procedure in combination with other opioids;[5] and failing to halt the procedure when Carpenter's condition had deteriorated to the point where appellant found it necessary to try to obtain basic medical supplies from a nearby hospital.

One expert also identified appellant's numerous violations of the California regulations which govern liposuction procedures as well as the guidelines promulgated by the American Society of Anesthesiologists.[6] The California regulations require that a procedure resulting in the extraction of more than 5,000 cc's of aspirate must be

_____

[4] One expert expressed bewilderment at the length of a procedure that resulted in the removal of only 6,000 cc's of aspirate: "I don't know why you would start at 10:00 in the morning or whatever, finish at midnight, and remove only . . . six liters . . . that doesn't make sense to me. What are you doing there all that time?"

[5] Fentanyl is an opioid drug 50 to 100 times more potent than morphine. It is indicated for chronic pain where the patient no longer responds to weaker opioids or to manage pain at the end of a patient's life. Use of a fentanyl patch during a liposuction procedure is considered unusual and presents special risks due to the strength and variability of transdermal absorption of the drug.

[6] According to Dr. Selma Calmes, an anethesiologist who consulted with the coroner in this case, the guidelines require the use of monitoring equipment such as a blood pressure monitor, an EKG monitor, and a pulse oximeter whenever a patient is under sedation.

7

performed in a hospital or an accredited surgical center.  (Cal. Code Regs., tit. 16, § 1356.6, subd. (a).)  For a procedure resulting in the removal of more than 2,000 cc's of aspirate, the regulations require a pulse oximeter to monitor blood oxygen levels, a blood pressure monitor, an electrocardiogram, and fluid loss and replacement monitoring and recording.[7]  (Cal. Code Regs., tit. 16, § 1356.6, subd. (b).)  In addition, the California regulations require the presence of a person whose main job is to monitor the patient and keep records.  If the physician is administering the sedation, a licensed person certified in advanced cardiac life support must be present and monitoring the patient.  (Cal. Code Regs., tit. 16, § 1356.6, subd. (b).)  With the exception of manual blood pressure monitoring during Carpenter's procedure, appellant followed none of these requirements.

### Dr. Mohamed

Appellant testified in his own behalf at trial.[8]  He explained that he does not perform traditional liposuction, describing his methods as a "step above the most advanced techniques" employed by other doctors.  His advanced techniques produce better outcomes, but take much longer than traditional liposuction, which is why he

---

[7] A copy of section 1356.6 of the California Code of Regulations, in effect in 2010, was admitted as People's Exhibit 94.  In addition to the requirements cited by Dr. Calmes, the regulations provide that in a procedure resulting in extraction of 2,000 cc's or more of total aspirate, "There shall be a written detailed plan for handling medical emergencies and all staff shall be informed of that plan.  The physician shall ensure that trained personnel, together with adequate and appropriate equipment, oxygen, and medication, are onsite and available to handle the procedure being performed and any medical emergency that may arise in connection with that procedure."  (Cal. Code Regs., tit. 16, § 1356.6, subd. (b)(1).)  The regulations also provide that anesthesia may be administered only by a qualified, licensed practitioner.  (Cal. Code Regs., tit. 16, § 1356.6, subd. (b)(2).)

For any procedure resulting in the removal of more than 150 cc's of total aspirate, the regulations mandate that "[t]he following monitoring shall be available":  pulse oximeter, blood pressure, fluid loss and replacement monitoring and recording, and electrocardiogram.  (Cal. Code Regs., tit. 16, § 1356.6, subd. (b).)

[8] Appellant suffered convictions for forgery in 2012 and commercial burglary in 2013.

charges much more than other doctors.[9]  Although he did not hold the patent on the VASER liposuction machine he used, he planned to patent his unique method of performing VASER liposuction.

Appellant defended his use of the drugs administered to Carpenter and Handy, explaining that he keeps his patients alert during liposuction because he believes monitoring their condition through conversation is the fastest and most effective way to detect a problem.  Indeed, according to appellant, "If you wait for hypoxia to be detected by pulse ox you're an idiot" because by then it will be "very late."  He testified that he personally monitored Carpenter's pulse and oxygenation and recorded her vitals throughout the procedure.  While acknowledging that Carpenter was sedated during her procedure, he believed that monitoring and emergency equipment were required only when a patient was given intravenous sedation, not when oral sedatives were used.  But he admitted that he was not aware of the California regulations that applied to the procedures he was performing until he received notification from the California Medical Board that he had violated the law.

Appellant opined that Carpenter died due to undiagnosed and asymptomatic coronary disease, and he maintained that the doses of the various drugs he gave her were correct and safe.  He testified that he removed about 5,000 cc's of aspirate during Carpenter's liposuction, but admitted that his records of the procedure "were deficient in certain areas" and contained mistakes and omissions that may have made it difficult to interpret his notes.

---

[9] One expert dismissed appellant's claims, noting that Carpenter was told she would receive a unique treatment for $100,000, when in truth "there would be surgeons lined up to do that procedure for $15,000."

**DISCUSSION**

## I. Substantial Evidence Supports Appellant's Conviction for Involuntary Manslaughter

Appellant contends that as an active participant in Carpenter's surgery who administered the fatal dose of fentanyl, Evans was an accomplice, and without her uncorroborated testimony there was insufficient evidence to support appellant's conviction for involuntary manslaughter. Appellant further contends that the trial court erred by failing to instruct the jury sua sponte on principles of accomplice corroboration. Omission of such instructions, appellant maintains, violated his federal constitutional rights to a fair trial, to due process, to present a defense, and for a reliable judgment in accordance with the Fifth, Sixth, Eighth, and Fourteenth Amendments. We disagree. In the absence of any evidence to suggest that Evans knew Carpenter's surgery was performed in a grossly negligent manner or that she otherwise shared appellant's grossly negligent mental state, Evans cannot be considered an accomplice to appellant's commission of involuntary manslaughter. Moreover, even if Evans were an accomplice, there was abundant corroboration of her testimony, rendering any instructional error harmless.

### A. *Evans Was Not an Accomplice*

An accomplice is subject to prosecution for the identical offense charged against the defendant by reason of being a direct perpetrator, aider and abettor, or coconspirator. (§ 1111; *People v. Houston* (2012) 54 Cal.4th 1186, 1224.) "This definition encompasses all principals to the crime [citation], including aiders and abettors and coconspirators." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.) Thus, "[t]o be chargeable with an identical offense, a witness must be considered a principal under section 31 [and] must have ' "guilty knowledge and intent with regard to the commission of the crime." ' " (*People v. Lewis* (2001) 26 Cal.4th 334, 368–369; *People v. Boyer* (2006) 38 Cal.4th 412, 466.) Even where an act has the effect of giving aid and encouragement, there can be no accomplice liability in the absence of knowledge of the criminal purpose of the person aided. (*People v. Valdez* (2012) 55 Cal.4th 82, 147; *People v. Williams* (2008) 43 Cal.4th

10

584, 637 [evidence of acts assisting crimes did not establish the requisite mental state for accomplice liability as a matter of law]; *People v. Beeman* (1984) 35 Cal.3d 547, 559.)

A conviction for involuntary manslaughter requires criminal negligence in the commission of the offending act. (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 135; *People v. Penny* (1955) 44 Cal.2d 861, 879.) Our Supreme Court has defined criminal negligence as " ' "aggravated, culpable, gross, or reckless . . . conduct . . . [that is] such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . ." ' [Citation.] 'Under the criminal negligence standard, knowledge of the risk is determined by an objective test: "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' " (*People v. Valdez* (2002) 27 Cal.4th 778, 783; *Williams v. Garcetti* (1993) 5 Cal.4th 561, 574 ["there can be no criminal negligence without actual or constructive knowledge of the risk"]; *Walker v. Superior Court*, *supra*, 47 Cal.3d at pp. 135–136 ["criminal negligence must be evaluated objectively"].)

Appellant contends Evans must be considered an accomplice not only because she assisted in the surgery on Carpenter, but because she administered a fatal dose of her personal prescription of fentanyl to Carpenter—"something that an ordinary person would have reasonably known was not acceptable." But appellant's culpability for Carpenter's death was not predicated simply on the single instance of allowing his office assistant to administer a fentanyl patch to his patient, but on his multiple flagrant deviations from reasonable standards of medical care which amounted to criminal negligence.

Moreover, according to appellant's own testimony, it was he, not Evans, who made every decision pertaining to the medical care Carpenter received during her procedure. Thus, it was appellant, not Evans, who determined what medications and what dosages to give Carpenter before and during the surgery; it was appellant, not Evans, who had the training and expertise to predict and avoid the potential toxic effects of the cocktail of pain killers administered to Carpenter before and during her surgery; it

11

was appellant, not Evans, who monitored Carpenter's pulse and oxygenation and recorded her vital signs throughout the procedure; it was appellant, not Evans, who determined what monitoring and safety equipment to have on hand for his surgical procedures; and it was appellant, not Evans, who performed the liposuction procedure and determined what amounts of infiltrate and aspirate were appropriate and safe for Carpenter. Finally, it was appellant, not Evans, who was responsible for knowing and following the law as it applied to the liposuction procedures he was performing in his non-accredited facility.

Evans, who was not even qualified as a nurse, much less a physician, clearly did not share appellant's medical knowledge, training, and background to enable her to appreciate the risks presented by appellant's multiple deviations from accepted standards of medical care, which ranged from ordering a potentially lethal cocktail of opioids and pain killers for his patient to conducting a nearly 12-hour surgical procedure without basic monitoring or medical safety equipment while assisted by unqualified personnel. Because Evans could not have been guilty of involuntary manslaughter as a direct perpetrator, aider and abettor, or coconspirator, she bore no liability as an accomplice. (See *People v. Beeman*, *supra*, 35 Cal.3d at p. 560 [aider and abettor shares perpetrator's intent when he knows full extent of criminal purpose and gives aid or encouragement with intent of facilitating commission of the crime]; *People v. Smith* (2014) 60 Cal.4th 603, 611; *People v. Morante* (1999) 20 Cal.4th 403, 416 ["conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy"].)

B. *Evans's Testimony Was Sufficiently Corroborated to Support the Conviction and Render Any Instructional Error Harmless*

Even if Evans could be considered an accomplice, her testimony was corroborated by appellant's own testimony. Moreover, abundant evidence other than Evans's testimony connected appellant to the crime and supported his conviction. Accordingly,

12

any error in failing to instruct on the need for corroboration of Evans's testimony must be deemed harmless.

Section 1111 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." "If sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the jury, even in the absence of a request." (*People v. Brown* (2003) 31 Cal.4th 518, 555.)

However, a trial court's erroneous omission of instruction under section 1111 is harmless if there is sufficient corroborating evidence in the record for the accomplice's testimony. (*People v. Valdez*, *supra*, 55 Cal.4th at p. 147; *People v. Hinton* (2006) 37 Cal.4th 839, 880.) "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Valdez*, *supra*, 55 Cal.4th at pp. 147–148; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303–304 ["even in cases where the full complement of accomplice instructions . . . was erroneously omitted, we have found that sufficient corroborating evidence of the accomplice testimony rendered the omission harmless"].) Furthermore, a defendant's own testimony and the reasonable inferences therefrom may supply the necessary corroboration for an accomplice's testimony. (*People v. Williams* (1997) 16 Cal.4th 635, 680; see also *People v. Hinton*, *supra*, 37 Cal.4th at p. 880.)

Here, we need look no further than appellant's own testimony to find ample corroborative evidence that "tend[s] to connect the defendant with the commission of the offense." (§ 1111; see *People v. McDermott* (2002) 28 Cal.4th 946, 986.) As set forth above, appellant made every decision pertaining to the medical care Carpenter received during her procedure. Appellant testified clearly that he alone made the determinations

13

about which drugs to give Carpenter, and how much to give her. Appellant also stated that he alone was responsible for monitoring Carpenter's pulse, oxygenation, and level of consciousness, as well as recording her vitals throughout the procedure. Appellant's testimony further established that he performed the liposuction procedure and determined what amounts of infiltrate and aspirate were appropriate and safe for Carpenter. Finally, appellant admitted that he had no monitoring or emergency equipment available during Carpenter's surgery, he did not believe such equipment was necessary, and he was unaware of regulations requiring such equipment.

Other witnesses also provided corroboration to connect appellant with the commission of the offense. The coroner's investigator, Betsy Magdaleno, testified that the surgical room in which Carpenter died lacked basic monitoring and emergency equipment, including an EKG machine, pulse oximeter, oxygen tanks, and crash cart. Statements made by appellant during his interview with Magdaleno immediately after Carpenter's death, as well as photographs of the scene and medical and autopsy records established the length of the procedure, the amount of aspirate removed, and the quantities and schedule of drugs given to Carpenter throughout the day. Finally, the nursing supervisor at Encino Hospital confirmed appellant's frantic attempt to obtain basic medical supplies shortly before Carpenter died.

The evidence other than Evans's testimony that connected appellant to the crime in this case was a far cry from the "slight" corroborative evidence required under section 1111: It was extensive and overwhelming. Accordingly, any error in the court's failure to give accomplice instructions was harmless.

## II. The Jury Properly Made a Great Bodily Injury Finding as to the Involuntary Manslaughter Conviction Pursuant to Section 1192.7

Characterizing the jury's great bodily injury finding under section 1192.7 as an enhancement, appellant contends the finding must be stricken because "no great bodily injury enhancement could attach to the [in]voluntary manslaughter conviction." In so arguing, appellant relies on *People v. Cook* (2015) 60 Cal.4th 922, in which our Supreme

14

Court held that the great bodily injury enhancement under section 12022.7 does not apply to a conviction for murder or manslaughter. (*Id*. at p. 938.)

Appellant would be correct if the trial court had imposed a great bodily injury enhancement under section 12022.7; it did not. Rather, the jury made its great bodily injury finding in this case under section 1192.7, subdivision (c)(8), which means that in any future proceeding against appellant, his conviction for involuntary manslaughter will qualify as a prior "serious felony." The finding was not made under section 12022.7, nor was it used to enhance appellant's sentence. Because appellant makes no attempt to explain why the jury's finding under section 1192.7 would be invalid, his claim fails.

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.


LUI, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

15