Filed 12/24/25  Valentine v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| KAYLA VALENTINE,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SOLANO COUNTY,<br><br>    Respondent;<br><br>PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Real Party in Interest. | No. A172891<br><br>  (Solano County Super. Ct.<br>    Nos. F24-01572, F24-00178) |

Kayla Valentine, charged in two cases with offenses involving possession for sale of controlled substances, challenges the denial of her request for pretrial mental health diversion.  She argues the trial court's finding that she was not suitable for diversion was improperly based on legislation that postdated her offenses and, alternatively, an abuse of discretion.  We disagree with the first of these contentions.  As to the second, because the court's ruling appears to rest on an incomplete analysis, we find it appropriate to remand for reconsideration.

1

# BACKGROUND

## I.

### *Factual Background*

Valentine was charged by complaint filed on January 26, 2024, (No. F24-00178), with bringing a controlled substance into a jail (Pen. Code, § 4573[1]).  She was charged in a second complaint filed on July 23, 2024 (No. F24-01572), with possession for sale of methamphetamine (Health & Saf. Code, § 11378); sale, offer to sell or transportation of methamphetamine (*id.,* § 11379, subd. (a)); possession for sale of fentanyl (*id.,* § 11351); sale, offer to sell or transportation of fentanyl (*id.,* § 11352, subd. (a)); and misdemeanor possession of narcotics smoking paraphernalia (*id.,* § 11364, subd. (a)).

According to the testimony at a preliminary hearing in case No. F24-01572, on January 29, 2024, Vacaville police officers responded to a report of a person who appeared to be unconscious in a vehicle.  Officer Eutsler saw Valentine exit the vehicle from the driver's seat and a male, subsequently identified as Jose Delatorre, exit from the passenger seat and go into a store.  Eutsler contacted Valentine.  While Eutsler was speaking with Valentine, Officer Reustle arrived and looked into the vehicle for the reported unconscious person.  She did not see anyone in the vehicle but observed a methamphetamine pipe with white residue and burn marks on it in the center console of the car and a firearm on the passenger side next to the center console.  Valentine was arrested, as was Delatorre, who was located inside the store.

---

[1]  Further statutory references will be to the Penal Code except as otherwise specified.

In further investigation of the car, officer found a white powdery substance on the front seat that appeared to be fentanyl; needles in the front passenger door pocket; a wallet on the driver's side that contained Valentine's identification and about $3,000 in $100 bills;[2] a plastic bag on the driver's side in which there were four or five smaller plastic bags containing, respectively, a white, chalky substance; a white, granular, crystal-like substance; a white, compressed, powder-like substance; a pink compressed powder; and another white, granular, crystal-like substance; and, on the rear seat, a backpack containing an electronic weight scale and a plastic bag holding multiple smaller plastic bags and $23 cash. Substances in four of the bags found in the car were tested and determined to contain 24.99 grams of methamphetamine, 1.07 grams of cocaine base, 22.57 grams of fentanyl and 7.03 grams of fentanyl, respectively. An expert testified that the methamphetamine and fentanyl were possessed for sale and transportation, based on the amount of each and the individual baggies, cash and scale. The 24.99 grams of methamphetamine and 22.57 grams of fentanyl were significantly more than the 1 to 3 gram average daily amount for personal use.

At the end of the first day of the preliminary hearing, after brief discussion about issues with Valentine taking off her GPS monitor and failing to keep it charged, the court terminated her "Pre-Trial Services," remanded her to custody and set bail.

---

[2] Valentine told the police she had taken the money out of her safe to purchase a car for Delatorre.

At the conclusion of the preliminary hearing, Valentine was held to answer on all counts in case No. F24-01572. An information charging the same offenses was filed on September 5, 2024.

## II.

### *Request for Diversion*

On October 25, 2024, Valentine filed a request for pretrial mental health diversion pursuant to section 1001.36. As we will further explain, section 1001.36 gives trial courts discretion to grant pretrial diversion to a defendant who satisfies specified eligibility and suitability requirements, including that a diagnosed mental disorder was a significant factor in the commission of the charged offense and that the defendant will not pose an unreasonable risk of danger to public safety. (§ 1001.36, subds. (a), (b)(1) & (2), (c)(4).)

Valentine's diversion request included a report from Clinical and Forensic Psychologist Natalie Rajagopal, who opined that Valentine met the criteria for posttraumatic stress disorder (PTSD), opioid use disorder, and amphetamine-type substance use disorder. Rajagopal found "clear evidence" that PTSD and substance use "would have played a significant role in the commission of the charged offense" and stated, "Possession of methamphetamine, Fentanyl, and related paraphernalia would be consistent with Ms. Valentine's reported use of drugs to escape negative thoughts and distress associated with past trauma." Noting that Valentine was currently engaged in treatment and reported a "high degree of motivation" to continue, Rajagopol opined that based on Valentine's "openness to treatment and available treatment options for PTSD and substance use," the "symptoms motivating the criminal behavior (substance use related to past trauma)" would respond to mental health treatment. In Rajagopol's opinion, "[i]f

4

Ms. Valentine engages in a structured treatment program and maintains sobriety, there is no reason to think she would pose an unreasonable risk of danger to public safety."

The People opposed diversion, urging that Valentine was not suitable because she would present an unreasonable risk of danger to public safety if she was treated in the community and continued to engage in the sale of fentanyl and methamphetamine. The opposition quoted declarations in the recently enacted 2024 "Homelessness, Drug Addiction and Theft Reduction Act" initiative (Ballot Pam., Gen. Elec. (Nov. 5, 2024) text of Proposition 36) (Proposition 36) describing the extreme danger posed by fentanyl (Prop. 36, § 3, subd. (b)(1)) and stating that " '[t]his act would authorize greater consequences for hard drug dealers whose trafficking kills or seriously injures a person who uses those drugs . . . .' " (*Id.*, § 3, subd. (b)(2).) The People further noted that the offenses Valentine was charged with were among those included in a new statute requiring that defendants convicted of specified offenses related to drug trafficking be advised they could be charged with murder if they engaged in such conduct and thereby caused death. (Health & Saf. Code, § 11369, subd. (b).) The People argued Valentine should not be released into the community, where engaging in sales of fentanyl "may result in the death of a human being."

On November 22, 2024, the court found a prima facie showing for diversion and ordered a Forensic Triage Team (FTT) report. FTT reported that Valentine had said she was receiving mental health services through La Clinica, the services were sufficient to meet her needs, and she was working with her attorney and family to "get connected to Ujima Rectory for residential substance use disorder treatment."

5

Valentine entered The Rectory drug and alcohol recovery treatment facility on December 11, 2024, and a January 23, 2025 letter from the program stated that she was fully participating in all activities and compliant with all requirements. In further support of her request for diversion, she submitted proof of attendance at 22 "social support," Narcotics Anonymous and Alcoholics Anonymous meetings between December 12, 2024, and January 22, 2025. She also submitted documentation showing she had inherited $50,000 in December 2023 and "negotiation of large currency transactions that paid for the quantity of narcotics discovered on January 29, 2024."

At a hearing on February 10, 2025, defense counsel urged the court to see Valentine's involvement in drug sales as a one-time situation occasioned by her inheritance. Counsel told the court that Valentine had been sexually assaulted multiple times as a youth, resulting in her PTSD; that over the next 15 years, with the help of mental health therapy, she had been able to maintain a career in nursing and raise her children; but several years before the hearing she had lapsed into addiction, lost her job and begun using drugs and "helping her abusive boyfriend," who was "using her to sell some of his drugs." Counsel told the court that being remanded to custody "got [Valentine's] attention" and she made immense changes, including regaining family support and getting herself into the residential treatment program where she had been for two months at the time of the hearing.

The People argued the court should find Valentine would pose an unreasonable risk of danger if treated in the community under section 1001.36 diversion because the evidence showed she possessed drugs for sale, not personal use. The prosecutor stressed the dangerousness of Valentine's offense by reference to the advisement and harsher consequences

6

called for under Proposition 36, which he argued reflected the Legislature and electorate's determination that such offenses "should be treated more significantly."

The court acknowledged that Valentine "may" be eligible for diversion "in light of the doctor's notes" but focused on suitability as the problematic issue because of the danger of selling fentanyl. As we will further discuss, the court referenced Proposition 36 with respect to the lethality of fentanyl and consequent dangerousness of Valentine's conduct.

Valentine filed the present writ petition on April 7, 2025. We denied the petition by order of June 9, 2025, after which the California Supreme Court granted review and transferred the case to us with directions to vacate our order and issue an order to show cause. Our order to show cause issued on August 4, 2025, and we subsequently received the People's return and Valentine's reply.

## DISCUSSION

### I.

### *Writ Review Is Appropriate.*

"A writ of mandate 'must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law.' (Code Civ. Proc., § 1086.) ' " ' "The question whether there is a 'plain, speedy and adequate remedy in the ordinary course of law,' within the meaning of the statute, is one of fact, depending upon the circumstances of each particular case, and the determination of it is a matter largely within the sound discretion of the court." ' " ' (*Flores v. Department of Corrections & Rehabilitation* (2014) 224 Cal.App.4th 199, 206.)" (*Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 686.)

7

Valentine argues appeal is not an adequate remedy because diversion is a pretrial option and, if her claims were raised in a postconviction appeal, she would have to meet the high burden of demonstrating prejudice. The People dispute these assertions but agree that we should resolve the merits. In light of the parties' agreement as well as the California Supreme Court's direction to issue the order to show cause, we agree that writ review is warranted.

## II.

### *Pretrial Mental Health Diversion*

Mental health diversion pursuant to section 1001.36 requires "trial court findings that the defendant is both *eligible* for diversion and *suitable* for the program. The criteria for each are specified in the statute. (§ 1001.36, subds. (b), (c).) Defendants are eligible if they have been diagnosed with a recognized mental disorder that was a significant factor in the commission of the criminal offense with which they are charged. (*Id.*, subd. (b).) They are suitable if: (1) in the opinion of a qualified mental health expert, the defendant's mental disorder would respond to treatment; (2) the defendant agrees to waive their speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) the defendant will not pose an 'unreasonable risk of danger to public safety' as defined in sections 1170.18 and 667, subdivision (e)(2)(C)(iv). (§ 1001.36, subd. (c).)" (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 891 (*Sarmiento*).)

"A trial court's ruling on a request for mental health diversion is reviewed for abuse of discretion, and the court's factual findings are reviewed for substantial evidence. (*People v. Moine* (2021) 62 Cal.App.5th 440, 448-449.) 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision

8

on express or implied factual findings that are not supported by substantial evidence.' (*Id.* at p. 449.) A trial court further abuses its discretion if its decision 'is so irrational or arbitrary that no reasonable person could agree with it.' (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)" (*Gomez v. Superior Court, supra,*113 Cal.App.5th at p. 687.)

The only disputed issue in this case is whether the trial court abused its discretion in finding Valentine would pose an unreasonable risk of danger if granted diversion. Section 1001.36 defines unreasonable risk of danger by reference to the definition in section 1170.18 (§ 1001.36, subd. (c)(4)), which in turn defines the phrase as "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667" (§ 1170.18, subd. (c)). The offenses specified in section 667, subdivision (e)(2)(C)(iv) are "any homicide offense (including any attempted homicide offense), solicitation to commit murder, assault with a machine gun on a peace officer or firefighter, possession of a weapon of mass destruction, any serious or violent felony punishable by life imprisonment or death, and certain sex offenses." (*People v. Williams* (2021) 63 Cal.App.5th 990, 1001 (*Williams*).)

" 'The violent felonies encompassed in this definition "are known as 'super strikes.' . . . By requiring an assessment of whether the defendant "will commit a new violent felony" within the meaning of section 667, subdivision (e)(2)(C)(iv), a trial court necessarily must find the defendant is "likely to commit a super-strike offense." [Citation.] Thus, the risk of danger is narrowly confined to the likelihood the defendant will commit a limited subset of violent felonies.' " (*Williams, supra,* 63 Cal.App.5th at p. 1001,

quoting *People v. Moine, supra,* 62 Cal.App.5th at pp. 449-450; *Sarmiento, supra,* 98 Cal.App.5th at p. 892.)

III.

*Analysis*

**A. The Trial Court Did Not Apply Proposition 36 Ex Post Facto.**

Proposition 36 sought to "reform laws that have dramatically increased homelessness, drug addiction, and theft throughout California" by means including providing drug and mental health treatment for people addicted to hard drugs, adding fentanyl to certain existing laws on possession and trafficking of hard drugs, and "reinstat[ing] penalties for hard drug dealers whose trafficking kills or seriously injures a drug user." (Prop. 36, § 2, subds. (a)–(f).) Proposition 36's "Findings and Declarations" include the following: "Fentanyl is the most dangerous drug that our nation has ever seen. Because it is largely produced synthetically, fentanyl is typically cheaper than other hard drugs. As a result, drug dealers now regularly include fentanyl in other drugs, including diet, anxiety, and sleeping pills, cocaine, and heroin. Further, fentanyl is up to 50 times stronger than heroin. Therefore, a very tiny amount of fentanyl can prove deadly. One kilogram (2.2 pounds) of fentanyl provides enough of the drug to manufacture four to ten million doses, or enough to kill 500,000 people. Finally, because such a small amount of fentanyl is necessary to create addiction, it is easier to smuggle across the border in smaller, yet much more deadly quantities." (Prop. 36, § 3, subd. (b)(1).) As earlier mentioned, Proposition 36 enacted Health and Safety Code section 11369, which requires courts to advise persons convicted of enumerated offenses that if they engage in the specified conduct, including selling drugs, and that conduct results in death, the seller

10

could be charged with "homicide, up to and including the crime of murder." (Health & Saf. Code, § 11369, subd. (b).)[3]

Proposition 36 was approved by the voters at the November 5, 2024 election and took effect on December 18, 2024, almost a year after Valentine's January 29, 2024 arrest. Valentine argues the court improperly applied Proposition 36 to her case ex post facto by "ascrib[ing] a greater level of dangerousness to [her] conduct than existed at the time of her arrest."

"The *ex post facto* prohibition forbids the Congress and the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.' [Citations.] Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." (*Weaver v. Graham* (1981) 450 U.S. 24, 28-29, fns. omitted.) "[T]wo critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." (*Id.* at p. 29, fns. omitted.) "[T]he focus of the *ex post facto* inquiry is not on whether

---

[3] The required advisory statement provides: " 'You are hereby advised that it is extremely dangerous and deadly to human life to illicitly manufacture, distribute, sell, furnish, administer, or give away any drugs in any form, including real or counterfeit drugs or pills. You can kill someone by engaging in this conduct. All drugs and counterfeit pills are dangerous to human life. These substances alone, or mixed, kill human beings in very small doses. If you illicitly manufacture, distribute, sell, furnish, administer, or give away any real or counterfeit drugs or pills, and that conduct results in the death of a human being, you could be charged with homicide, up to and including the crime of murder, within the meaning of Section 187 of the Penal Code.' " (Health & Saf. Code, § 11369, subd. (b).)

a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." (*California Dept. of Corrections v. Morales* (1995) 514 U.S. 499, 506, fn. 3.) "[E]ven if a law operates to the defendant's detriment, the *ex post facto* prohibition does not restrict 'legislative control of remedies and modes of procedure which do not affect matters of substance.' [Citation.] Hence, no *ex post facto* violation occurs if the change in the law is merely procedural and does 'not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt.' " (*Miller v. Florida* (1987) 482 U.S. 423, 433 (*Miller*).)

The trial court denied diversion because of the danger inherent in selling fentanyl, noting that it would not have been averse to diversion if the case involved possession for personal use. The court observed that Proposition 36 addressed the lethality of fentanyl and problems it was causing ("looking at the California voters and Prop 36 that is now—in fact, it's not just in California. It looks like it seems to be a problem across the United States"). After stating that selling fentanyl has a "high risk" of a "potential super strike because a very small amount of Fentanyl kills," the court concluded that "the selling of Fentanyl is part of the super strike. The voters have voted on Prop 36 . . . ."

The court's reasoning is obvious: Because a very small amount of fentanyl is sufficient to kill a person, there is a high risk that a person who purchases fentanyl may die; if this happens, the seller may be convicted of homicide, which is a super strike offense; so a person who sells fentanyl has a high risk of committing a super strike and therefore is dangerous within the meaning of section 1001.36.

Valentine likens her case to *Miller,* which held that application of a new sentencing law violated the ex post facto prohibition because it " 'substantially disadvantaged' " the defendant by " 'mak[ing] more onerous the punishment for crimes committed before its enactment.' " (*Miller, supra,* 482 U.S. at pp. 433, 435-436.) In *Miller,* when the defendant committed the offense, the presumptive sentence was three and a half to four and a half years, but by the time of sentencing, the range had been revised to five and a half to seven years. (*Id.* at p. 423.) The seven-year sentence the defendant received did not require explanation and was not reviewable because it was within the new presumptive range. (*Id.* at pp. 432-433.) Under the guidelines in effect at the time of the offense, however, in order to impose a sentence exceeding four and a half years, the court would have had to provide clear and convincing reasons and its decision would have been subject to appellate review. (*Id.* at p. 432.)

Valentine argues that, "like in *Miller,*" the trial court's "application" of Proposition 36 to her conduct, which preceded its enactment, "effectively deprived [her] of her opportunity to participate in pretrial mental health diversion." In her view, the trial court "*ex post facto* imbued [her] with a knowledge and understanding about the particular lethality of Fentanyl, and the newly elevated consequences of participating in the sale of Fentanyl, before the California voters acted on the issue."

We disagree. Proposition 36 did not alter the definition of Valentine's offenses or the penalties to which she was exposed, nor did it change any aspect of the eligibility or suitability criteria for mental health diversion. The trial court referenced Proposition 36 on two points, the dangerousness of fentanyl and its sale, and the fact that the sale of fentanyl can support a

13

murder conviction. Proposition 36 highlighted both points, but neither was new.

The trial court emphasized the lethality of fentanyl in distinguishing possession for sale from personal use, noting that it would have found diversion appropriate if Valentine had possessed the drug for personal use. The extreme dangerousness of fentanyl was widely recognized before the voters adopted Proposition 36. (See *Commonwealth v. Burton* (Pa. Super.Ct. 2020) 234 A.3d 824, 833 ["In the midst of today's opioid epidemic it is common knowledge that fentanyl is particularly deadly. Specifically, the toxicologist testified that fentanyl is 40-50 times more potent than heroin and 100 times more potent than morphine"]; *People v. Tseng* (2018) 30 Cal.App.5th 117, 126 ["Fentanyl is an opioid 100 times more potent than morphine"]; *People v. Mohamed* (2016) 247 Cal.App.4th 152, 158, fn. 5 ["Fentanyl is an opioid drug 50 to 100 times more potent than morphine"]; *U.S. v. Hamilton* (D.Idaho, Jan. 27, 2021, No. 1:18-cr-00086-DCN-1) 2021 WL 276690, *4 ["A lethal dose of fentanyl is only 3 milligrams"].) Proposition 36 was not necessary to conclude that possession of fentanyl for sale implicates public safety far more than simple possession for personal use.

The potential for a murder conviction resulting from sale of fentanyl also preexisted Proposition 36. " '[S]econd degree murder based on implied malice has been committed when a person does " ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life" ' . . . ." ' " (*People v. Saucedo* (2023) 90 Cal.App.5th 505, 512, quoting *People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*).) The new warning required by Health and Safety Code section 11369 would facilitate proof of the intent required for

14

implied malice by providing evidence that the defendant had been informed of the deadly consequences of selling drugs, but the statute did not create a new crime of murder by sale of fentanyl. Further, the advisement does not relate to section 1001.36 pretrial diversion in that it is given only if and when a defendant is convicted of the drug offense and refers to potential consequences of *future* conduct.

The point is illustrated by the analogous "*Watson* advisement" (*Watson, supra,* 30 Cal.3d 290) given to defendants convicted of driving under the influence or alcohol-related reckless driving. When someone is killed by an intoxicated driver who was aware of the risk to life and consciously disregarded it, the driver has committed second degree murder. (*People v. Doyle* (2013) 220 Cal.App.4th 1251, 1265.) The *Watson* advisement informs the defendant of the danger of driving under the influence of alcohol or drugs and warns that the defendant may be charged with murder if the defendant continues to drive under the influence and someone is killed as a result. (Veh. Code, § 23593.)[4] But the potential for liability for murder existed before Vehicle Code section 23593 was enacted: Legislative history reflects that Vehicle Code section 23593 was intended to facilitate proof of implied malice by showing an individual who signed the advisement after a conviction for driving under the influence was aware of the danger posed by drinking and driving. (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 2173 (2003-2004 Reg. Sess.) as introduced Mar. 30, 2004 [Author's

---

[4] " 'You are hereby advised that being under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and, as a result of that driving, someone is killed, you can be charged with murder.' " (Veh. Code, § 23593, subd. (a).)

Statement]; see Levenson & Ricciardulli, Cal. Criminal Law (The Rutter Group 2025-2026 ed.) § 11.79.)

Here, the court referred to Proposition 36 as reflecting the voters' recognition of the extreme danger posed by fentanyl and the need to combat sales and trafficking of hard drugs. (Prop. 36, § 2, subds. (a)–(f), § 3, subd. (b).) As we have said, Proposition 36 did not announce a previously unrecognized danger or create a new offense of drug-related homicide, and there is no basis in the record for finding any likelihood the trial court would have granted diversion if not for Proposition 36. In short, to the extent Proposition 36 informed the trial court's view of the dangerousness of selling fentanyl, it did not amount to an ex post facto application of the legislation.

## B. The Trial Court's Ruling Does Not Reflect an Individualized Analysis of Dangerousness.

Valentine argues that even if the trial court did not violate the ex post facto prohibition, the court abused its discretion in denying her diversion request. As we have said, the denial hinged on the court's finding that Valentine would pose an unreasonable risk of danger to public safety if treated in the community; there was no dispute over or discussion of other eligibility or suitability criteria. As we have also said, an unreasonable risk of danger for purposes of section 1001.36 is "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of" section 667, subdivision (e)(2)(C)( iv)—in other words, a likelihood that Valentine would commit a super strike offense if granted diversion. (*Williams, supra,* 63 Cal.App.5th at p. 1001; *Sarmiento, supra,* 98 Cal.App.5th at p. 892.) The super strike of concern to the trial court was homicide resulting from the sale of fentanyl. Thus, the court's dangerousness finding amounts to a finding that if Valentine was granted diversion, it is

16

likely she would continue to be involved with sales of fentanyl *and* likely her conduct would result in a death; sale of fentanyl in itself is not a super strike.

Section 1001.36 provides that in determining whether a defendant will pose an unreasonable risk of danger to public safety, the court "may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)  Valentine argues the trial court abused its discretion by denying diversion solely on the basis of the prosecutor's argument that fentanyl is more lethal than other drugs and a person who sells fentanyl that results in death could be charged with murder.  In Valentine's view, the court improperly disregarded the opinions of defense counsel and the mental health expert, Valentine's success in treatment during the two months since her release on bail; and her lack of violent or criminal history.

Disputing this view, the People emphasize that the court said it "look[ed] at *everything,*" which the People point out would include Valentine's moving papers and the attached psychological evaluation report; the court specifically mentioned having reviewed the preliminary hearing transcript; and the court acknowledged its awareness that Valentine "was not by herself" at the time of the offense.  But Valentine does not suggest the court was not aware of all the relevant information; her contention is based on the court's explanation of its ruling, which makes no reference to her individual circumstances and likelihood of reoffending.

The court made five related points:  1) the question it had to answer was whether Valentine was suitable for diversion; 2) fentanyl is a problem in California and across the United States; 3) fentanyl is extremely lethal even

17

in small amounts; 4) there is a high risk that selling fentanyl will result in death and 5) a homicide resulting from sale of fentanyl would be a super strike. Missing from the court's explanation of its ruling is any analysis of or reference to the likelihood of Valentine selling fentanyl while being treated in the community. The court appears to have concluded Valentine was not suitable for diversion simply because the evidence indicated she was involved in selling fentanyl, there is a high risk that selling fentanyl will result in a death, and, if successfully prosecuted as a homicide, a super strike within the meaning of section 1001.36's definition of danger to public safety.[5]

The People maintain that, under the usual standards for appellate review, we must defer to all the trial court's express and implied factual findings that are supported by substantial evidence (*People v. Flores* (2024)

---

[5] The court's ruling, in full, was as follows:

"All right. I did find that she does have a prima facie showing and she may also be eligible in light of the doctor's notes. The problem that the Court has is whether or not she is suitable, is the issue that the Court had to wrestle with.

"And in looking at everything, and looking at the California voters and Prop 36 that is now—in fact, it's not just in California. It looks like it seems to be a problem across the United States.

"The one is with Fentanyl, specifically when they're selling Fentanyl, there is a high risk that there is a potential of super strike because a very small amount of Fentanyl kills. And so, it's not in this case that she was just using. If it was her just using the Court would not have a problem putting her in Mental Health Diversion. But the fact of the matter, when the Court reviewed the transcript there was—there was evidence of possession of sales. There were cheesecake bites of Fentanyl.

"There was—this Court saw 37.33 grams of Fentanyl, 7.747 grams of methamphetamine, 33.278 grams of other Fentanyl that was in bags. It's very lethal.

"I get it, she was not by herself, but this—they both were selling. And so, the Court is going to find that the selling of Fentanyl is part of the super strike. The voters have voted on Prop 36, and at this point the Court is going to deny Mental Health Diversion."

15 Cal.5th 1032, 1043; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1055), and they offer a number of inferences the trial court might have drawn to support a conclusion that Valentine would not be able to maintain sobriety and therefore would sell drugs to support her addiction. The evidence the People see as supporting this conclusion includes Valentine's choice to sell fentanyl despite its lethality, the length of her addiction, the fact that the psychologist recommended treatment for mental health and addiction issues without focusing specifically on Valentine's engagement in drug sales, and the "conditional and somewhat tentative nature" of the psychologist's conclusion that Valentine would not pose a danger "if" she engaged in a structured treatment program and maintained sobriety.

Many of these points do not appear to be reasonable inferences from the evidence. For example, the People suggest the recommended treatment guidelines were not sufficient because Rajagopal's expectation that Valentine would not pose a danger to the public depended on Valentine's engagement with treatment and ability to maintain sobriety. The People argue that because Rajagopal's opinion was "conditional and somewhat tentative," it supports an inference that "even if petitioner participated in a treatment program, she would still pose an unreasonable risk to the public." We fail to see how this suggested inference is supported, as Rajagopal stated not only that Valentine was "currently engaged in treatment and reported a high degree of motivation to continue future treatment," but that "the symptoms motivating the criminal behavior would respond to mental health treatment."

The People argue that it can be inferred the treatment Rajagopal recommended would be insufficient to curb Valentine's involvement in selling hard drugs because Rajagopal only stated that Valentine's "possession" of fentanyl and methamphetamine was related to her mental disorder," not that

19

her "affirmative action of *selling*" the drugs was so related. To the contrary, as there is no evidence suggesting Valentine's involvement in selling drugs was motivated by anything other than her addiction, it is reasonable to infer treating her addiction and use would also address her selling.

Another example is the People's argument that it was reasonable to infer Valentine could have difficulty maintaining sobriety and resisting the temptation to sell drugs because her two months in residential treatment at the time of the diversion hearing was so brief in comparison to her years-long history of drug use. But the relevant question under section 1001.36 is whether Valentine would pose an unreasonable risk of danger to public safety "during or after inpatient or outpatient mental health treatment" (*People v. Burns* (2019) 38 Cal.App.5th 776, 789), not whether she posed such risk prior to the treatment she would receive through diversion.

In any event, our more fundamental concern is that the trial court's explanation of its ruling gives no indication the court made any evidence-based evaluation of whether Valentine, in light of her history, current circumstances and charged offenses, was *likely* to cause a death by selling fentanyl while being treated in the community or after such treatment. The court stated only that the evidence showed possession for sale, not just for personal use, and that selling fentanyl "is part of the super strike" because fentanyl is so lethal. So stated, the court's reasoning would apply in any case involving an offense related to the sale of fentanyl, regardless of the facts in a particular case. Neither section 1001.36 nor Proposition 36 categorically exclude possession for sale of fentanyl from eligibility for mental health diversion. Rather, as is apparent from the text of the statute and reviewing courts' analyses of relevant considerations, a finding that a defendant will pose an unreasonable risk if treated in the community must be based on an

20

assessment of the risk posed by that individual defendant in light of the circumstances of the offense and offender, including the offender's history and amenability to treatment. (§ 1001.36, subd. (c)(4); *People v. Moine, supra,* 62 Cal.App.5th at p. 450 [statute contemplates consideration of statutory and other appropriate factors in determining risk of danger]; *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1151-1152 [reversing denial of diversion];[6] *Williams, supra,* 63 Cal.App.5th at p. 1003 [reversing denial];[7] *People v. Pacheco* (2022) 75 Cal.App.5th 207, 213-214 [affirming denial].[8])

---

[6] The defendant in *People v. Whitmill* was charged with possession of a firearm by a felon, discharge of a firearm with gross negligence and criminal threats. Among the salient points discussed, the defendant ended the confrontation underlying the offenses, threw away the weapon and complied with police; his criminal history did not include violent offenses; the expert opined that defendant posed low risk of danger if abstinent from substance use and that he was amenable to treatment; and the evidence did not support the trial court's finding that it would be unreasonable to expect the defendant to be able to control his behavior. (*People v. Whitmill, supra,* 86 Cal.App.5th at pp. 1151-1152.)

[7] The defendant's offenses in *Williams,* stalking and criminal threats, terrorized victims but did not involve actual violence; the defendant had no criminal history; experts opined he posed low risk to public safety; and he had been released on bond for two years without incident. (*Williams, supra,* 63 Cal.App.5th at p. 1003.)

[8] The defendant in *Pacheco,* charged with arson of forest land, intentionally set a fire near a highly populated homeless encampment, the response to which involved 15 units from multiple fire departments, two helicopters and a specialized plane; the expert opined the defendant was unlikely to reoffend if he was compliant with psychiatric medication and abstinent from methamphetamine but, if he was not, he would become unstable, psychotic and likely to reoffend, and court found the defendant's resolve to stop using methamphetamine "dubious" in light of his 14-year history of daily use undeterred by multiple arrests for use. (*People v. Pacheco, supra,* 75 Cal.App.5th at pp. 209-211, 214.)

The People argue that even if a defendant meets all the statutory eligibility and suitability criteria, the court retains residual discretion to deny diversion. (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 887.) Citing the court's explanation of its ruling, the People assert that the court made an "individualized determination" that Valentine was "unsuitable for diversion because of the risk she represented."

There are several problems with this argument. First, as we have explained, the court's ruling does not reflect the individualized determination the People attribute to it. Second, the court's residual discretion does not permit it to "reject a request for diversion based on an alternative meaning of 'public safety' inconsistent with the specific statutory definition in section 1001.36, subdivision (c)(4)." (*Sarmiento, supra,* 98 Cal.App.5th at p. 896.) The People argue that Valentine's "potential harm to others" is not limited to selling hard drugs, "[f]urnishing or giving fentanyl to another person who then becomes addicted or dies also represents the risk of danger to the public," and "[t]he fact that [Valentine's] companion was unconscious weighed heavily in support of the superior court's concern about the danger [Valentine] posed if treated in the community." Putting aside the fact that the record does not appear to support the People's assertion that there was actually an unconscious person in Valentine's car,[9] to the extent the People

---

[9] The People provide no citation to the record to support this assertion and the preliminary hearing transcript does not support it. According to the police officers' testimony, although they arrived at the location of Valentine's car in response to a report of a person in a vehicle who appeared to be unconscious, neither of the officers in fact saw an unconscious person. When Officer Eutsler arrived, he saw Valentine exit the driver's seat and a male exit the passenger seat and go into a store. When Officer Reustle arrived, she looked into the vehicle for the reportedly unconscious person and did not see anyone.

are suggesting the court could rely on a more amorphous concept of danger, they are incorrect.

Further, the evidence the People describe as supporting the trial court's conclusion that Valentine posed an unreasonable risk of danger to public safety is evidence that fentanyl is extremely dangerous and that Valentine possessed amounts showing possession for sale rather than personal use. There can be no dispute that fentanyl is an extraordinarily dangerous drug and its illegal sale poses serious danger to public safety. But the People's singular focus on the dangerousness of Valentine's offense excludes any assessment of Valentine's likely conduct in the future. The dangerousness of Valentine's offense is part of the necessary analysis, but the court also had to find it likely Valentine would engage in the sale of fentanyl, and likely the sale would result in a death, despite (i.e., during or after) treatment—which, according to Rajagopal's recommendation, would address both mental health and substance abuse issues and would be in an inpatient setting until Valentine achieved psychiatric stability allowing for a lower level of care. The dangerousness of Valentine's current offenses does not fully address this question.

Finally, the court's focus on the danger inherent in Valentine's offenses leaves unclear whether the court gave due consideration to the legislative policy underlying section 1001.36. As we have previously recognized, " 'the statute's express purpose of promoting " '[*i*]*ncreased diversion* of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety' " indicated "the Legislature intended the . . . program to apply as broadly as possible." ' " (*Williams, supra,* 63 Cal.App.5th at p. 1004, quoting *People v. Frahs* (2020) 9 Cal.5th 618, 630.) In deciding whether a defendant meets the criteria for

diversion, "the 'strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community' should inform a trial court's discretion." (*Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 138.)

We do not conclude the circumstances of this case compelled the court to grant diversion. But the case required more than a determination that Valentine committed an extremely dangerous offense that could have tragic consequences if repeated. Because the trial court does not appear to have examined the individual circumstances bearing on the likelihood of Valentine committing a super strike offense if treated in the community, the decision to deny the request for diversion must be reconsidered.

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to reconsider Valentine's request for mental health diversion pursuant to section 1001.36 in light of the considerations addressed in this opinion and current circumstances, and enter a new order granting or denying the request.

24

STEWART, P. J.

We concur.

RICHMAN, J.

DESAUTELS, J.

*Valentine v. Superior Court* (A172891)