Filed 5/13/26  P. v. Delvillar CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>ANGEL DELVILLAR,<br><br>　　Defendant and Appellant. | F085963<br><br>(Super. Ct. No. 1432625)<br><br><br>**OPINION** |

　　APPEAL from a judgment of the Superior Court of Stanislaus County.  Shawn D. Bessey, Judge.

　　Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Hannah Janigian Chavez, Deputy Attorneys General, Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In 2013, appellant Angel Delvillar was convicted by jury of the first degree murder of Julio Jimenez (Pen. Code,[1] § 187, subd. (a), count 1), robbery of an inhabited dwelling (§ 212.5, subd. (a), count 2), and robbery (§ 211, count 3). As to counts 2 and 3, the jury also found true gang enhancements under section 186.22, subdivision (b)(1), and gun-use enhancements under section 12022.53, subdivisions (d) and (e)(1).[2]

In this appeal, following the 2018 enactment of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 4), Delvillar, who was convicted in 2013 under the felony murder rule, filed a petition seeking resentencing on his conviction for murder. At the conclusion of an evidentiary hearing, the court found that Delvillar was guilty of murder as a major participant in the underlying robbery who acted with reckless indifference to human life. As a result, Delvillar's petition was denied.

Delvillar raises the following arguments. First, the trial court violated his right to due process by resolving disputed factual issues based primarily on the transcripts from his trial. Second, the accomplice testimony detailing Delvillar's participation in the home invasion was not sufficiently corroborated by independent evidence. And finally, there is insufficient evidence to support the trial court's conclusion that he was a major participant in the home invasion who acted with reckless indifference to human life. We affirm the denial of Delvillar's petition for resentencing.

## FACTUAL AND PROCEDURAL HISTORY

On September 21, 2011, a Stanislaus County Grand Jury returned an indictment charging Delvillar and four codefendants with murder (§ 187, subd. (a); count 1), robbery of an inhabited dwelling (§ 212.5, subd. (a); count 2), and robbery (§ 211; count 3). As

---

[1]    All further undefined statutory citations are to the Penal Code unless otherwise indicated.

[2]    Delvillar was tried with codefendants Hector Joaquin Rocha, Jr., Phillip Lopez, Jr., and Jaime Cerpa. They are not parties to the instant appeal.

to count 1, the indictment alleged that the murder was committed during the commission of a robbery and that all defendants were principals. As to counts 2 and 3, it was further alleged that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that all defendants were principals who violated section 186.22, subdivision (b), with at least one principal personally and intentionally discharging a firearm and proximately causing death (§§ 12022.7, 12022.53, subds. (d), (e)(1)).

On February 8, 2013, a jury found Delvillar guilty as charged. The court sentenced Delvillar to an indeterminate term of 25 years to life on count 1, plus consecutive determinate terms of four years on count 2 and one year on count 3. The court also imposed two consecutive terms of 25 years to life for the section 12022.53, subdivisions (d) and (e)(1) firearm enhancements on counts 2 and 3. The section 186.22, subdivision (b)(1) enhancement on counts 2 and 3 were stayed.

On May 3, 2018, this court affirmed the judgment of conviction on direct appeal but remanded the matter back to the lower court with directions, in relevant part, for the court to consider whether to exercise its discretion to strike the firearm enhancements pursuant to section 12022.53, subdivision (h). (See §§ 12022.53, subd. (h), 1385.)

On March 26, 2019, Delvillar filed a petition for resentencing pursuant to former section 1170.95, now renumbered as section 1172.6.

On May 24, 2019, the prosecutor filed an opposition to Delvillar's petition.

On June 26, 2020, the prosecutor filed a second opposition, alleging that Delvillar failed to make a prima facie showing of relief.

On October 23, 2020, Delvillar filed a response to the prosecutor's opposition, arguing that that record did not establish that he was a major participant in the robbery who acted with reckless indifference to human life.

On June 29, 2021, the prosecutor filed a supplemental brief. The prosecutor conceded that the trial court should issue an order to show cause and hold an evidentiary hearing.

On January 31, 2022, the trial court found Delvillar made a prima facie showing and issued an order to show cause.

On February 27, 2023, following an evidentiary hearing, the trial court denied Delvillar's petition for resentencing.[3]

A timely notice of appeal followed.

*The Underlying Conviction*

     *A.     The Prosecution's Case*

     *1.  Accomplice Testimony*

On March 24, 2010, Delvillar, along with eight or 10 others, carried out a planned home invasion, during which one of the victims was shot and killed. Three accomplices testified pursuant to agreements with the prosecution: Aquiles Virgen, Daniel Flores, and Domingo Becerra. In exchange for their truthful testimony, Virgen was offered a sentence of 15 years to life, Flores a sentence of six years, and Becerra a sentence of 25 years to life. Their testimony is summarized as follows:

     *a.  Aquiles Virgen*

On March 23, 2010, Johnny "Manos" Montalvo organized a meeting at a residence in Keyes to plan a home invasion robbery. At Montalvo's direction, Virgen brough fellow gang members Phillip Lopez and Santos Cardenas with him.

Virgen and Montalvo were both Norteño gang members, and of the roughly eight to 10 men present during the planning discussions, Virgen identified many of them as members of or affiliated with the same gang, including: Hector Rocha, Delvillar, Daniel

---

[3] On December 8, 2023, the trial court resentenced Delvillar. The appeal from that resentencing hearing is currently pending before this court in case No. F087310.

Flores, Domingo Becerra, Santos Cardenas, and a man known to Virgen only as "Snoop." [4]

Montalvo instructed the group, including Delvillar, to go into the target house, take any drugs inside, and return to the Keyes residence with the proceeds. Virgen testified that participants were not promised individual payment and that any proceeds from the home invasion would go to incarcerated members of the gang. The meeting lasted approximately 15 minutes.

With the assistance of Montalvo and Becerra, who brought in five guns, members of the group armed themselves before departing. Delvillar carried a single-shot shotgun; Virgen had a .357 revolver that was provided by Domingo and Montalvo; Flores possessed a nine-millimeter pistol; Rocha carried another .357; and Becerra had either a .32- or .38-caliber revolver. Virgen did not see Lopez with a firearm. Virgen loaded his firearm.

Rocha drove one of the two groups to the target residence — a home on Thrasher Avenue in Modesto, in his Jeep. Becerra sat in the front passenger's seat, while Virgen sat in the backseat between Delvillar and Daniel Flores. Lopez rode in the cargo area. A red car driven by Santos Cardenas followed behind to divert police attention, if necessary. On the way, Rocha stopped at a gas station to fill up his Jeep. The red vehicle followed.

Delvillar's group reached the Thrasher Avenue residence shortly after midnight on March 24th. They saw an SUV was unexpectedly parked in the driveway. The men covered their faces with makeshift masks.

After circling the block once, the group decided to proceed with the planned home invasion. Rocha parked his Jeep and all six men inside ran to the SUV and pulled two

---

[4] Later identified as John Rivera

men and a woman from the inside.  During the ensuing confrontation, Virgen lost sight of the red decoy vehicle.

Unable to access or breach the front door of the residence, the men moved the victims into the backyard where they placed them on their hands and knees.  Virgen held the victims at gunpoint.

Two or three of the men entered the house through broken windows in the back of the house, while Lopez remained out front as a lookout.

Virgen and one other member of the group remained in the backyard.  He heard shouting from inside the house, a struggle, and then a gunshot.  Two more gunshots followed, as well as the sound of police sirens.  Virgen, and all five of his accomplices in the red Jeep, ran back to the Jeep and drove away.  The men discarded their masks and all but one of the firearms out of the window.

Within five minutes, Rocha's Jeep was spotted by a police cruiser.  A pursuit ensued, during which more than 10 police vehicles followed Rocha's Jeep.  The Jeep stopped after running over a spike strip.  The group got out of the vehicle and fled in different directions.

Virgen was detained 20 to 30 minutes later while hiding in someone's backyard.  When he was transported back to the police department, Virgen noticed that Delvillar had not been detained.  When he spoke to detectives about the home invasion, he did not mention Delvillar's involvement.

At some point after his arrest, Virgen saw Delvillar in jail. Delvillar told him that when the group fled on foot, he hid inside of a laundry room until the police left the area.

### b.  Daniel Flores

Flores, a self-admitted gang member, was first introduced to the Norteño gang at 14 years old.  According to Flores, the Keyes residence was a Norteño gang hub occupied by Cerpa, who went by the gang moniker of Joker.

6.

On March 23, 2010, Montalvo instructed Flores, who was then 15 years old, to come to the house in Keyes. Montalvo told Flores to bring his nine-millimeter Taurus pistol, while Flores's brother, Juan, carried a single-barreled sawed-off shotgun.[5] Flores stated that his gun was loaded.

Rocha, Zachary Spinella, Sergio Gutierrez, Juan, and Flores arrived at the Keyes residence together in a Jeep driven by Rocha. Flores identified all occupants in the Jeep as "Norteños" or "Northerners," explaining that the former denotes an earned rank within the gang.

When the group arrived, there were about 12 to 15 people present, including Delvillar. Flores put his nine-millimeter on the kitchen table to load it. He observed a .38 revolver and a .357 revolver lying on the table as well.

Montalvo informed the group that they were going to commit a home invasion at a residence in Modesto to steal money and crystal methamphetamine. After the home invasion, the group would return with the proceeds to the Keyes residence. According to Flores, John "Snoop" Rivera ordered the group not to shoot or hurt anybody unless they posed a threat to their lives. He added, "If anything, wound them, don't kill them."

Approximately 15 minutes later, Rocha departed from the Keyes residence in his Jeep, with Becerra in the front passenger's seat, Delvillar in the rear compartment, and Virgen, Flores, and Lopez in the back. A red car with Montalvo, Rivera, and one other individual followed.

A green SUV was parked in front of the Thrasher Avenue residence. The group forced its three occupants out, attempted to enter the residence using one of the victim's keys, and when they could not, took the victims into the backyard. Flores took the female victim's purse and kicked and hit one of the victims.

---

[5]     We refer to Flores's brother Juan by his first name throughout the remainder of this opinion because they share the same last name. No disrespect is intended.

Three of the perpetrators entered through the back door by kicking the door down. Flores, who remained outside, heard yelling from inside the house. Then, a gunshot rang out from inside the home, followed by one or two more.

As Flores looked inside the home, one of the victims in the backyard attempted to flee by climbing over the fence. Flores pulled him down by his shirt and warned that "if he moves again, [he was] going to shoot him." At that time, Lopez was positioned at the front of the house, and the remaining men—Delvillar, Rocha, Virgen, and Becerra—were inside. Within a minute, Becerra ran out of the house. The victim who had tried to jump the fence, later identified as Jimenez, said something in Spanish, and as he was lying flat on the ground with his hands over his head, Becerra shot him in the back.

Just before the shooting, Flores heard sirens in the distance. He announced, "[W]e got to go," and yelled for the group to get back into the Jeep. All six men got back into the Jeep and took off. Flores saw the red decoy vehicle as they fled the Thrasher residence, but lost sight of it after that.

The men discarded their face masks. Becerra gathered all but one of the guns and began throwing them out of the window. Flores stashed his nine-millimeter handgun underneath his seat.

The group drove to the Parklawn area of Modesto before the Jeep was completely disabled. After fleeing on foot, Flores was quickly detained by police.

### c. Domingo Becerra

Becerra, a longtime Norteño who was also a police informant, testified that Jaime Cerpa, known as "Joker" summoned him to the Keyes residence on March 23, 2010. Becerra identified Cerpa as a "big homie," meaning he had authority over younger members of the gang.

Becerra brought his .357-caliber handgun with him, which he kept concealed in his waistband. Becerra dropped off his mother's red Toyota and got a ride to Cerpa's

house (the Keyes residence) with two acquaintances. It was still daylight when he arrived.

After Cerpa arrived, the group discussed committing a home invasion. Becerra suggested the target residence, which was a known drug house. While he was there, Montalvo and Joe Ramirez arrived. Montalvo arrived with a firearm concealed underneath his shirt.

At some point while he was at the Keyes residence, Delvillar and drove Becerra and Montalvo to pick up Snoop Rivera in Modesto. When they returned, Becerra hid his gun under the sofa.

The second time Becerra departed from the Keyes residence, Delvillar drove Becerra, Rivera and Montalvo to pick up Becerra's "homie," Johnny, to confront him about talking badly about the regiment. When they returned to the Keyes house, all the remaining participants in the home invasion had arrived. The group ripped up clothing to use as makeshift masks and Becerra distributed firearms to the participants.

Becerra had already retrieved his firearm from the couch cushion. He loaded it with ammunition provided by Montalvo. Two or three of the men ripped up clothing to use as masks. They wore multiple layers of clothing so that they would be more difficult to identify.

Rocha drove the red Jeep with Becerra, Flores, Lopez, and Virgen, while Rivera drove Delvillar, Cardenas, Montalvo, and another unidentified male in Becerra's mother's red Toyota, which they had retrieved earlier. Becerra testified that everyone that participated in the home invasion was gang affiliated, and that everyone inside of the Jeep was armed.

The plan was for the group to enter the target residence through a back gate. However, once they arrived, they noticed a garbage dumpster blocking the alleyway. The group contemplated whether to proceed with the home invasion. Becerra told Rocha to drive around to the front.

9.

As they reached the front of the house, a green SUV pulled up. Believing the SUV belonged to the homeowners, Becerra's group removed its occupants and tried to use the driver's keys to access the front door. When that was unsuccessful, they forced the victims to the backyard at gunpoint. Becerra testified that the ensuing events transpired rapidly.

Becerra claimed that he did not see Delvillar at the property because Delvillar was walking around the block as a lookout for law enforcement. He stated that his accomplices in the red Toyota parked two houses away.

Becerra hit one of the victims in the SUV with the barrel of his gun and told him to "Get the fuck down." Virgen and Flores hit another victim with their guns.

Unable to access or break down the front door of the residence, Becerra instructed Virgen to start breaking windows to help Rocha get inside. When Virgen, Rocha, and Becerra accessed the home, Becerra began looking for drugs in a room separated from the main house.[6]

Becerra heard Flores, who was outside, state that one of the victims was getting up. Becerra went into the backyard and observed Jimenez trying to jump over the fence. Then, he heard gunshots erupt from inside the house.

As Jimenez was crawling and pleading, Becerra shot him three times in the back. Simultaneously, Becerra heard police sirens in the distance. After the group fled in Rocha's Jeep, Becerra collected the guns and masks and discarded them out of the window.

Becerra did not mention Delvillar's participation in the crime until grand jury proceedings, and at trial, he claimed that Delvillar was not among the group that fled in Rocha's Jeep.

---

**6**      Responding officers subsequently explained that there was a studio-style apartment in the backyard. It was described as a sealed-off room with a door and no windows.

10.

### 2. The Victims' Testimony

#### a. Isaias Pantoja

Pantoja lived with his two-year-old daughter at the Thrasher Avenue residence. He testified that he cleaned homes for a living and he neither sold nor possessed drugs. He had begun renting the Thrasher Avenue residence only three weeks earlier.

According to Pantoja, on the night of the home invasion, he and his daughter were asleep in the living room when he was awoken by shouting. When he peered out of the window, he saw five or six individuals wearing blue and black clothing and carrying weapons. They had handkerchiefs covering their faces.

Pantoja observed two people being led and one being dragged to the backyard. One of the men was being hit. As Pantoja was on the phone with 911, he heard multiple windows being broken.

Three men entered Pantoja's home and took his cellular phone from him. One of the assailants demanded Pantoja's money and then hit him with the butt of his pistol. They took approximately $110 from his wallet.

Pantoja heard one gunshot from inside the residence, and one from outside. The men fled once they heard police sirens. Pantoja estimated that they were in his home for approximately four or five minutes.

#### b. Corina Vargas

Vargas testified that she and her friend, "Tino," went to the Thrasher residence to buy methamphetamine.[7] While walking there, Vargas and Tino caught a ride with an acquaintance, a man driving a green SUV that Vargas knew only as Jose (Jimenez).

When they arrived, Vargas saw eight to 10 persons wearing black and coverings over their faces surround the SUV. According to Vargas, all the assailants were armed

---

[7] Fortino "Tino" Soto, could not be located at the time of trial.

with firearms. Two of the men came into the SUV and demanded that Vargas and her companions get out of the vehicle.

The men took her purse and told Vargas to "Shut the fuck up or [they would] kill her." During the encounter, Vargas heard someone shout the word, "[N]orte."

Two of the assailants forced Vargas into the backyard and made her lie on the ground. Vargas then heard two or three gunshots coming from inside of the home, yelling, and infant crying, and the sound of windows breaking. She heard police sirens approaching.

One of the assailants came into the backyard and told Jimenez to get on the ground. As he pled for his life, Jimenez was shot four or five times in a quick succession. Vargas stayed on the ground as the perpetrators fled over the fence. Eventually, when she saw no one else around, she got up and ran home. The following day, a detective came to her home and returned her purse and identification card.

Vargas did not identify or otherwise describe any of her assailants. She stated that they sounded "really young."

### 3. Law Enforcement Investigation/Non-Accomplice Evidence

At approximately 12:42 a.m., officers responded to a report of shots fired at the Thrasher Avenue residence. They found Jimenez deceased in the backyard with gunshot wounds. They also found broken windows, a broken fence, blood spatter throughout the inside of the residence, blood droplets outside of the home, and two bullet strike marks—one in the kitchen ceiling and the other in the mudroom.

Following a police pursuit, officers apprehended Becerra, Flores, Rocha, Virgen, and Lopez in the Parklawn area. At 1:24 a.m., law enforcement stopped a red Toyota driven by Rivera and occupied by Montalvo and Cardenas. However, because law enforcement had no information tying the Toyota or its occupants to an active crime, Rivera and his companions were released.

12.

After Becerra was apprehended, he directed law enforcement to the locations where he had discarded the guns and masks. Along the route, police found a single-barrel 12-guage shotgun, broken into three pieces, with a live round; pieces of red cloth; two loaded .357 revolvers; a loaded .38 Smith & Wesson special revolver; live shotgun rounds; a black cotton glove; a piece of a white t-shirt; and a black latex glove. A chrome-finished .357 revolver Becerra described was never recovered.

The day after the incident, officers found a red Toyota at Becerra's mother's home. Delvillar's wallet was located inside the glove box.

E.O., who lived in the Parklawn area, later found her laundry shack disturbed and a shirt that was not hers inside. E.O. brought the black and gray Pendelton shirt to the police station. A police report written by Detective Craig Grogan, a detective with the Modesto Police Department, indicated that the Pendleton shirt likely belonged to an unknown suspect.

At the grand jury proceedings on September 19 and 20, 2011, Becerra and Flores had already entered into plea agreements with the prosecutor in exchange for their truthful testimony. Only then did Becerra and Flores implicate Delvillar in the home invasion robbery.

Delvillar was not arrested until September 17, 2011, when he was taken into custody for an unrelated homicide. He was remanded into custody for the instant offense on September 27, 2011.

### 4. The Gang Evidence

The prosecutor theorized that the home invasion was committed for the benefit of the Stanislaus-area Norteño criminal street gang. Detective Sean Martin with the Modesto Police Department testified as a gang expert for the prosecutor. Based on his training and personal experience, Detective Martin described the structure and practices of the Norteños, the hierarchy of the gang, how members identify their affiliation with the gang, and the use of younger members for criminal activities.

13.

*B.     The Defense's Case*

*1.  Hector Rocha*

Rocha testified that Montalvo ordered him to drive his Jeep and that Delvillar gave him money for gas.  He claimed that Delvillar entered the house with him, that he (Rocha) fired two shots into the ceiling, and that Delvillar took Pantoja to another room, after which Pantoja returned bleeding.  Rocha heard three shots outside in rapid succession, causing him and Delvillar to flee through the back door.  According to Rocha, he did not see anybody lying on the ground as they fled through the backyard because it was dark.

*2.  Delvillar*

Delvillar presented no separate trial defense evidence.

<u>The Evidentiary Hearing on Delvillar's Petition</u>

*A.     Delvillar's Testimony*

Delvillar was 18 years old at the time of the currently charged offense.  He had already been a Northerner for two years.

The day before the home invasion, he was summoned to the Keyes residence by Montalvo, whom he identified as a higher-ranking member of the gang.  According to Delvillar, the regiment often conducted gang operations out of the Keyes Avenue residence.

Delvillar ran multiple errands throughout the day before returning to the Keyes Avenue residence.  While there, Rivera informed Delvillar that Montalvo and Becerra were planning a robbery.  Montalvo instructed everyone involved to grab one of the five guns that were scattered on the table.  Some of the men had their own guns.

The target was a drug dealer.  Becerra pulled a map out of his pocket and began going over details.  Shirts were being torn and distributed to all the participants who had a gun to use as masks.

Rivera told Delvillar that his role would be to secure the perimeter, while Lopez would act as a lookout for the front of the house.

Delvillar claimed that Rocha, Becerra, Flores, Virgen and Lopez were supposed to ride in the Jeep, and that he (Delvillar), Santos, and another unidentified Black male would ride in the Toyota. All the occupants in the Jeep were armed and masked, while those in the red car were unarmed.

When they arrived at the Thrasher Avenue residence, Delvillar put his wallet in the glove compartment so that he would not have it on him if he were apprehended. Delvillar exited the Toyota, went around the back of the car, and crossed the street. The Jeep passed by him before it parked in front of the target residence.

Delvillar observed a few people exit the Jeep before he walked towards the alley. He heard glass breaking followed by one gunshot and then three more. Delvillar observed three people run from the house into the Jeep, followed by two more people. Unable to find the Toyota, he made a split-second decision to flee with his companions in Rocha's Jeep.

The police spotted Rocha's Jeep shortly thereafter, resulting in a pursuit. Shortly after the vehicle was disabled, everyone inside the Jeep fled on foot. Delvillar entered a residential laundry room, removed his jacket, and hid inside until the police left.

B. *The Trial Court's Ruling on Delvillar's Petition Following the Evidentiary Hearing*

On February 27, 2023, the trial court denied Delvillar's petition for resentencing, finding beyond a reasonable doubt that he was a major participant in the home invasion who acted with reckless indifference to human life.

The court stated that Delvillar was an active Norteño gang member and had been conducting "gang business" on the day of the offense. It found that he was present at the Keyes residence where the robbery was planned, and although he did not direct others or

assign roles, he participated in the planning process by receiving information about the target, the weapons to be used, and his expected role.

The court recognized that the testimony of Delvillar's accomplices was inconsistent in several respects. Virgen, Flores, and Rocha testified that Delvillar was in Rocha's Jeep, that he was armed, and that he entered the Thrasher Avenue residence, where one of the victims was assaulted. Becerra, in turn, claimed that Delvillar was unarmed, was never in Rocha's Jeep, and that Delvillar acted as a lookout during the home invasion. Delvillar also testified at the evidentiary hearing that he was unarmed, claimed he was stationed near an alley as a lookout, but admitted he had fled in Rocha's Jeep following the home invasion.

The court observed that Becerra's version of events was inconsistent and, in some respects, unreliable. Becerra, for example, claimed that Delvillar was not in Rocha's Jeep after the group fled the crime scene, contradicting Delvillar's admission that he fled in the Jeep.

Based largely on Rocha's testimony, the court found that Delvillar was among the group that forcibly removed the victims from the green SUV, took Vargas's purse, and that he entered the Thrasher Avenue residence with a chrome revolver, where he physically assaulted Pantoja with the firearm. These factors, according to the court, supported the conclusion that Delvillar was a major participant in the home invasion who acted with reckless indifference to human life. The court specifically observed that "[Delvillar] was part and parcel [to] the violence" that preceded Jimenez's murder and surmised that Rocha's gunfire inside the home may have triggered Becerra to fatally shoot Jimenez in the backyard.

16.

**DISCUSSION**

I.     THE COURT'S CONSIDERATION OF THE TRIAL RECORD AT
       DELVILLAR'S SECTION 1172.6 EVIDENTIARY HEARING

Delvillar contends that the trial court violated his right to due process under the Fifth and Fourteenth Amendments by resolving disputed factual issues at the section 1172.6 evidentiary hearing based solely on the written record of prior trial testimony. Notwithstanding the fact that previously admitted evidence is authorized by subdivision (d)(3), section 1172.6, Delvillar argues that due process requires the prosecution to present live testimony when material factual disputes exist. We find Delvillar's claims unpersuasive.

       *A.     Applicable Law: Section 1172.6 Proceedings*

We begin our analysis with a discussion of the role of the trial court at section 1172.6 petition proceedings. If the trial court determines that the petitioner has made a prima facie showing of entitlement to relief under section 1172.6, it must issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subds. (c), (d).) The prosecution bears the burden of proving, "beyond a reasonable doubt," that the petitioner is ineligible for resentencing. (§ 1172.6, subd. (d)(3).) At that hearing, the trial court may make factual findings, credibility determinations, and weigh evidence. (*People v. Harden* (2022) 81 Cal.App.5th 45, 51.)

"Although the parties may offer new or additional evidence to meet their respective burdens, section 1172.6, subdivision (d)(3) does not contemplate a whole new trial on all the elements of murder. [Citation.] Rather, '[t]he retroactive relief provided by [section 1172.6] is a legislative "act of lenity" intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment.' " (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952.)

B.      *Analysis*

Subdivision (d)(3) of section 1172.6, which governs the admissibility of evidence at an evidentiary hearing, provides the following:

> "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed…. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of [s]ection 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule." (§ 1172.6, subd. (d)(3).)

Ordinarily, a witness's former testimony is considered hearsay and must fall within an exception to be admissible. (See, e.g, Evid. Code, § 1291.) However, the Legislature created a specific exception to this rule for section 1172.6 evidentiary hearings.

As our colleagues in Division Four of the First Appellate District explained in *People v. Davenport* (2023) 95 Cal.App.5th 1150, this "provision unambiguously provides that a trial court ruling on the merits of a resentencing petition 'may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony.' " (*Id.* at p. 1158, citing § 1172.6, subd. (d)(3).) Under section 1172.6, the admissibility of former testimony is not conditioned upon the prosecutor's ability to show that the witness is unavailable under Evidence Code section 1291. Rather, "the basis for admission of testimony at the hearing or trial in which it was previously admitted must remain a valid basis for admitting the testimony 'under current law.' " (*Davenport,* at p. 1158.)

*Davenport's* interpretation of subdivision (d)(3) of section 1172.6 is consistent with the interpretation offered by Division Three of the Fourth Appellate District in *People v. Cody* (2023) 92 Cal.App.5th 87. There, the appellate court addressed the admissibility of trial transcripts at a section 1172.6 evidentiary hearing. The court

specifically considered whether the prosecutor was required to demonstrate the unavailability of the trial witnesses under Evidence Code section 1291 as a precondition for admitting their prior testimony. The appellate court recognized that subdivision (d)(3) of section 1172.6 states: " '[t]he admission of evidence in the [evidentiary] hearing shall be governed by the Evidence Code….' " (*Cody*, *supra,* at p. 104.) However, the court clarified that the law explicitly allows for the admission of former testimony, explaining, "the law has an explicit exception that provides for the admission of former testimony: 'The admission of evidence in the hearing shall be governed by the Evidence Code, *except that* the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including *witness testimony*….' " (*Ibid.*)

Section 1172.6, subdivision (d)(3) thus expressly authorizes the court to consider evidence previously admitted at any prior hearing or trial, provided that the evidence remains admissible under current law. Nothing in the statutory scheme requires the presentation of live testimony when the same evidence was already subject to cross-examination and the record is otherwise sufficient for review. (*People v. Njoku* (2023) 95 Cal.App.5th 27, 43–47.)

Delvillar suggests that live testimony is constitutionally required whenever there are disputed facts at a section 1172.6 evidentiary hearing. But the evidentiary hearing under section 1172.6 is not a new trial; it is a collateral proceeding designed to determine whether a petitioner remains guilty of murder under the law as amended. (See *People v. James* (2021) 63 Cal.App.5th 604, 608; *People v. Hernandez* (2021) 60 Cal.App.5th 94, 111 ["section 1170.95 'involves a resentencing procedure, not a new prosecution' "], abrogated on other grounds by *People v. Lewis* (2021) 11 Cal.5th 952, 961–965; *People v. Robinson* (2024) 106 Cal.App.5th 854, 872, rev. granted Feb. 26, 2025, S288606, quoting *People v. Hill* (2024) 100 Cal.App.5th 1055, 1067–1068 [it is "a voluntary

19.

sentencing procedure derived from 'an act of legislative lenity,' not a new criminal prosecution"].)

Consequently, a section 1172.6 petitioner "does not possess many of the constitutional rights afforded to a criminal defendant at trial." (*People v. Njoku, supra,* 95 Cal.App.5th at pp. 44–45; see e.g., *People v. Hill*, *supra,* 100 Cal.App.5th at p. 1068 ["Resentencing under section 1172.6 is a completely voluntary process initiated by the petitioner, which cannot result in additional punishment. [Citation.] It therefore does not implicate double jeopardy concerns, and there is no Sixth Amendment right to a jury"]; accord, *People v. James, supra,* 63 Cal.App.5th at pp. 608–610 [Sen. Bill No. 1437 resentencing proceedings do not implicate a defendant's Sixth Amendment right to a jury trial]; *People v. Silva* (2021) 72 Cal.App.5th 505, 520 [same].)

Contrary to this authority, Delvillar asserts that due process compels live testimony any time there is a factual dispute in section 1172.6 proceedings. His claim is not however supported by citation to appropriate legal authority. The cases he relies upon pertain to issues arising in jury trials, more specifically, the mechanics of jury selection. (See *People v. Johnson* (2003) 30 Cal.4th 1302, 1319 [explaining that the mechanics of jury selection make it near impossible to evaluate, from a cold record, whether the retention of one juror and the dismissal of another are substantially similar]; *Johnson v. Finn* (9th Cir. 2011) 665 F.3d 1063 [addressing credibility issues in the context of a *Batson-Wheeler* challenge]; *People v. Reynoso* (2003) 31 Cal.4th 903, 918, fn. 4 [explaining the shortfalls of examining the prosecutor's stated reasons for exercising a peremptory challenge on a cold record].) We therefore find Delvillar's reliance on these cases unavailing.

Here, although the court's ruling involved credibility assessments based on prior testimony, we conclude that its reliance on the trial transcripts, rather than recalling every trial witness, did not deprive Delvillar of due process. The section 1172.6 evidentiary hearing was not a retrial of the case, but a collateral proceeding in which the court was

permitted to rely on the existing record to evaluate the evidence already presented. (See § 1172.6, subd. (d)(3).) Delvillar had a full and fair opportunity at trial to confront and cross-examine the witnesses against him, and the trial transcripts preserved that testimony for subsequent review. Under these circumstances, the court acted within its discretion in relying on the transcripts to assess credibility and resolve factual issues, and its procedure did not deprive Delvillar of due process.

## II. CORROBORATION OF THE ACCOMPLICES' TESTIMONY

Delvillar argues that the evidence was insufficient to establish that he rode in Rocha's Jeep to the home invasion robbery or entered the Thrasher Avenue residence, because the testimony of his accomplices was not adequately corroborated. He submits that absent independent, credible evidence showing that he arrived at the target residence in Rocha's Jeep or that he went inside, the record does not demonstrate that he was among the assailants who participated in the violence that culminated in Jimenez's death. Delvillar maintains that he remained outside the home, unarmed, acting as a lookout during the home invasion.

In response, the Attorney General observes that two of the victims, Vargas and Pantoja, described the crime at trial. According to the Attorney General, their testimony sufficiently corroborated the accomplices' testimony identifying Delvillar as among those who assaulted the victims in the green SUV and entered the Thrasher Avenue residence.

Although Delvillar minimized his role, he admitted that he had participated in the home invasion. The discovery of his wallet inside the red decoy vehicle, combined with his admissions, supplied ample corroborative evidence connecting him to the offense. We conclude that the trier of fact's findings regarding the degree of his culpability, specifically, that he acted as a major participant with reckless indifference to human life, were not subject to section 1111's corroboration requirement.

### A. Relevant Law

"Section 1111 provides, 'A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.' " (*People v. Aguirre* (2025) 18 Cal.5th 629, 675.) " 'Section 1111 serves to ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives.' " (*Ibid*.)

In determining whether corroborating evidence "tend[s] to connect the defendant with the commission of the offense" (§ 1111), the trier of fact may consider the entire conduct of the parties and their relationship to one another. (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.) The corroborating evidence " ' "may be circumstantial or slight and entitled to little consideration when standing alone." ' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32, quoting *People v. Abilez* (2007) 41 Cal.4th 472, 505.)

The corroborating evidence need not, by itself, establish every element of the crime or independently identify the perpetrator. (*People v. Abilez, supra,* 41 Cal.4th at pp. 505–506; *People v. Romero and Self, supra,* 62 Cal.4th at p. 32.) Nor must it corroborate the accomplice's testimony on every detail. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) Nevertheless, it must do more than merely show that a crime occurred or that the defendant associated with those who committed it; it must tend to connect the defendant personally with the commission of the offense. (*Abilez*, at p. 506; accord, *People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543 (*Falconer*).) "[A] defendant's own testimony and the reasonable inferences therefrom may supply the necessary corroboration for an accomplice's testimony." (*People v. Mohamed* (2016) 247 Cal.App.4th 152, 163.)

"[C]orroboration is not sufficient if it requires interpretation and direction to be furnished by the accomplice's testimony to give it value...." (*Falconer, supra,* 201 Cal.App.3d at p. 1543.) "To determine if sufficient corroboration exists, we must

22.

eliminate the accomplice's testimony from the case, and examine the evidence of other witnesses to determine if there is any inculpatory evidence tending to connect the defendant with the offense." (*Ibid.*)

"The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 985.)

B.      Analysis

Delvillar's wallet was found in the decoy vehicle and a t-shirt presumably belonging to him was recovered from E.O.'s laundry room. At the evidentiary hearing, Delvillar admitted that he was present during the planning of the home invasion; drove to the target residence with some of the participants in the red decoy vehicle; stashed his wallet in the glove compartment of that vehicle; acted as a lookout during the crime; fled along with his companions in Rocha's Jeep; and later hid inside of a laundry room until police left. This evidence amply corroborated his participation in the home invasion robbery.

Although this evidence does not independently establish the precise nature of Delvillar's role in the murder, section 1111 does not require as much. "When a special circumstance requires proof of a crime other than the charged murder, that crime cannot be proved by the uncorroborated testimony of an accomplice." (*People v. Avila* (2006) 38 Cal.4th 491, 570.) However, our Supreme Court has never held the inverse to be true—that independent corroboration is required to establish the degree of culpability for a felony-murder special circumstance. (*People v. Davis, supra,* 36 Cal.4th at p. 544, fn. 11.)

Here, the prosecutor was required to present evidence tending to connect Delvillar to the home invasion, not independent evidence establishing the precise nature of his

participation.  Once that threshold was satisfied, it was for the factfinder to evaluate the credibility of the accomplice testimony and determine the weight to assign to it.

Delvillar's assertion to the contrary is unsupported by citation to appropriate legal authority and is inconsistent with the purpose underlying section 1111.  The corroboration requirement exists to ensure that a defendant is not convicted solely on the testimony of an accomplice, given the potential for self-serving motives.  (*People v. Aguirre, supra,* 18 Cal.5th at p. 675.)

But in the context of section 1172.6 proceedings, the risk section 1111 is designed to guard against has already been eliminated.  The jury, properly instructed on section 1111, found Delvillar guilty beyond a reasonable doubt, necessarily determining that the accomplice testimony was sufficiently corroborated.  Because corroboration is a prerequisite to conviction, the verdict itself reflects that the section 1111 requirement was satisfied.  Section 1172.6 does not authorize the court to revisit that determination, or to apply a more demanding corroboration standard.

We are unaware of legislative changes suggesting that section 1111 has been expanded to apply to determinations of a defendant's degree of culpability, such as whether the defendant acted as a major participant with reckless indifference to human life.  In many felony-murder prosecutions involving multiple participants, the relative roles of each defendant are established primarily, if not exclusively, through accomplice testimony.  That is precisely the circumstance here.  There was no forensic evidence linking Delvillar to any of the recovered firearms, no surveillance footage or eyewitness identification placing him among the intruders inside the residence, and no statements by Delvillar admitting as much.[8]  Requiring corroboration in the manner Delvillar proposes

---

**8**      While Vargas and Pantoja described the manner in which the home invasion was carried out, their testimony did not link Delvillar to the crime.  Nothing in the record indicates that either of the witnesses identified Delvillar or provided a physical description of any of the perpetrators that vaguely resembled him.  Moreover, Vargas and Pantoja testified inconsistently concerning the number of perpetrators that were present

would transform section 1111's limited safeguard into a substantially heightened evidentiary burden, effectively requiring independent proof of the defendant's precise role in the underlying felony, something section 1111 neither requires or contemplates.

Assuming section 1111 applies to section 1172.6 petition proceedings—a proposition that the parties do not directly address—we conclude that ample independent evidence corroborated the accomplice testimony and tended to connect Delvillar to the home invasion. With that threshold satisfied, the trial court properly considered the accomplice testimony, along with the rest of the record, in assessing whether Delvillar was liable for murder.

III. SUFFICIENCY OF THE EVIDENCE SUPPORTING THE TRIAL COURT'S CONCLUSION THAT DELVILLAR IS GUILTY OF MURDER AS A MAJOR PARTICIPANT WHO ACTED WITH RECKLESS INDIFFERENCE TO HUMAN LIFE

Delvillar contends the trial court erred in finding him to be a major participant who acted with reckless indifference to human life. We disagree. We find substantial evidence supports the trial court's conclusion.

A.      *Relevant Law/Standard of Review*

At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3).) Accordingly, " 'it is the [trial] court's responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing under section [1172.6].' " (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984.)

---

and how many of them were armed. Vargas stated that the SUV was surrounded by eight to 10 masked individuals, all of whom were armed, while Pantoja observed five or six people outside of his window, only some of whom were armed.

On appeal from the denial of a section 1172.6 petition for resentencing, we review the trial court's ruling for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) "The scope of our review for substantial evidence is well settled. The test is not whether the People met their burden of proving beyond a reasonable doubt that [the petitioner] was ineligible for resentencing, but rather 'whether *any* rational trier of fact could have' made the same determination, namely that "[t]he record ... disclose[s] ... evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [as did the superior court]." (*People v. Williams* (2020) 57 Cal.App.5th 652, 663, quoting *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

" 'In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [superior court] could reasonably have deduced from the evidence. [Citation.] "Conflicts [in the evidence] ... subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge ... to determine the ... truth or falsity of the facts upon which a determination depends." ' " (*People v. Williams, supra*, 57 Cal.App.5th at p. 663, quoting *People v. Zamudio, supra,* 43 Cal.4th at p. 357.)

### B.     Analysis

In determining whether a defendant was a major participant who acted with reckless indifference to human life, our Supreme Court established a "spectrum of culpability" informed by two decisions by the United States Supreme Court, *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137. "On one end of the spectrum is *Enmund,* 'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.] At the other end is 'the felony murderer who actually killed, attempted to kill, or intended to kill.' " (*In re Scoggins* (2020) 9 Cal.5th 667, 675 (*Scoggins*); see *Tison*, at pp. 149–150.)

Our Supreme Court subsequently set forth relevant considerations in the determination of whether a defendant was a major participant who acted with reckless indifference to human life in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) [major participant] and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) [reckless indifference].

A defendant qualifies as a major participant if his or her involvement in the underlying felony was substantial rather than minor. Relevant considerations include: (1) the defendant's role in planning the criminal enterprise; (2) the defendant's role in supplying or using lethal weapons; (3) the defendant's awareness of particular dangers posed by the crime, the weapons used, or the conduct of other participants; (4) the defendant's presence at the scene and ability to facilitate or prevent the killing; and (5) the defendant's actions or inaction after lethal force was used. (*Banks*, *supra*, 61 Cal.4th at p. 803.)

A defendant acts with reckless indifference to human life when he or she is subjectively aware that his or her participation in the felony involves a grave risk of death and consciously disregards that risk. (*Scoggins, supra,* 9 Cal.5th at p. 677.) The inquiry includes both subjective and objective components. Subjectively, the defendant must be aware of and willingly involved in the violent nature of the crime. Objectively, the defendant's disregard for life must represent a gross deviation from the standard of conduct expected of a law-abiding person in the same situation. (*Ibid*.)

Factors that may assist in determining whether the defendant acted with reckless indifference include: (1) the defendant's knowledge of weapons and the number of weapons used; (2) the defendant's presence at the scene and opportunity to restrain the crime or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of any accomplice's likelihood of killing; and (5) the defendant's efforts, if any, to minimize the risk of violence. (*Clark*, *supra*, 63 Cal.4th at pp. 618–622.) All factors may be weighed together in determining whether the defendant's participation in a crime known to carry a grave risk of death was sufficiently significant to be deemed major. (*Ibid*.)

Although the inquiries under *Banks* and *Clark* are distinct, they often overlap. (*In re Loza* (2017) 10 Cal.App.5th 38, 52 ["factors demonstrating [the defendant's] role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference"].) The greater the defendant's participation in the felony, the more likely it is that the defendant acted with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 615.) No single factor under either *Banks* or *Clark* is necessary or sufficient. (*Banks*, *supra*, 61 Cal.4th at p. 803; *Clark*, at pp. 618, 621–623.)

### 1. Major Participant

#### a. Role in Planning the Crime

Delvillar was present at the Keyes residence when the home invasion was planned. The trial court concluded he "was engaged in the planning of the robbery" because he was "part of the process." Delvillar's presence at these discussions, however, does not establish that he directed, organized, or otherwise shaped the criminal plan. (See *Banks, supra*, 61 Cal.4th at p. 803; see e.g., *In re Ramirez* (2019) 32 Cal.App.5th 384, 404 [finding no reckless indifference where there was no evidence the defendant was involved in any planning beyond agreeing the group should commit an armed robbery of someone].)

Nothing in the record demonstrates that Delvillar exercised decision-making authority, supplied weapons to his confederates, recruited participants, or otherwise directed the actions of others. To the contrary, the evidence demonstrates that Becerra planned the home invasion; that the details of its execution were controlled by Montalvo, a high-ranking gang member; and that Delvillar assumed a subordinate role by carrying out their directives. Assuming Delvillar's presence during planning discussions constitutes evidence that he assumed a role in the planning of the crime, we conclude that this factor weighs only minimally in favor of a finding of major participation.

#### b. Role in Supplying or Using Lethal Weapons

There is no evidence that Delvillar supplied weapons or otherwise controlled access to the firearms used in the home invasion. The record instead reflects that while some participants brought their own firearms, Montalvo supplied firearms for the remaining participants.

There is evidence however that Delvillar used a firearm during the commission of the home invasion to physically assault Pantoja. Lopez testified that Delvillar, Rocha, Virgen, and Becerra entered the Thrasher Avenue residence. Virgen also identified Delvillar as being among the group that entered the target residence. He asserted that Delvillar took Pantoja to another room, and that when they returned, Pantoja was bleeding. Pantoja explained that one of the assailants hit him in the face with the butt of a gun and demanded money from him. This evidence supports the conclusion that Delvillar used a gun to pistol-whip Pantoja.

Delvillar asserted he was unarmed and remained outside during the home invasion, and Becerra provided similar testimony at trial. The trial court was entitled to reject that account, particularly because Becerra's assertion that Delvillar was not in the getaway vehicle contradicted Delvillar's own admission that he fled in Rocha's Jeep.

We conclude this factor weighs in favor of a finding that Delvillar was a major participant.

### c. Awareness of the Dangers Involved

The record contains no evidence that Delvillar knew any of his confederates were prone to lethal violence or that he anticipated a murder might occur before the crime began. Although his coparticipants were all Norteño gang members, gang affiliation alone does not establish awareness that lethal force was probable.

Even so, Delvillar knew the group was conducting a late-night home invasion of a residence associated with drug activity. His accomplices were masked and armed, meaning they reasonably expected to encounter civilians and resistance. Given the circumstances, "this was not a garden-variety robbery. [Citation.] The potential for it to

29.

turn violent was obvious." (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1011.) On balance, we conclude that this factor weighs in favor of a finding that Delvillar was a major participant.

### d. *Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid the Victim*

Delvillar was physically present during the home invasion and actively participated in the violence preceding the murder. When he and his confederates initially arrived, they pulled Jimenez and his companions out of the SUV, physically assaulted them, and then forced the victims by gunpoint into the backyard. Delvillar was also part of the group that entered the residence.

When Rocha fired the first shot inside the residence, the risk of lethal violence was readily apparent. Yet, rather than intervening or attempting to deescalate the situation, Delvillar pistol-whipped Pantoja.

We acknowledge that the record contains no affirmative evidence that Delvillar had an opportunity to prevent Becerra from shooting Jimenez. (See *In re Ramirez, supra,* 32 Cal.App.5th at p. 405 [finding that the defendant was not close enough to restrain the accomplice killer].) The evidence instead suggests that the shooting occurred in close temporal proximity to Rocha's second gunshot inside the Thrasher Avenue residence. But even assuming Rocha had no opportunity to stop the final fatal shot, he made no effort to restrain Rocha after the first or second shots, which were the catalyst for the fatal shooting.

We further observe that although Delvillar fled the scene rather than assisting Jimenez or waiting for law enforcement, the record does not establish that he fled with knowledge that anyone had been shot. Still, his presence during the escalating violence, combined with his failure to intervene when Rocha fired inside the residence, supports the conclusion that this factor weighs in favor of a finding of major participation.

### e. *Actions or Inactions Contributing to the Killing*

This factor also weighs in favor of a finding that Delvillar was a major participant. He was present and actively involved in the home invasion, including committing violence against one of the victims. He remained on scene when Rocha fired twice inside the residence, an action which dramatically increased the risk of lethal violence. Although the record does not show that Delvillar had an opportunity to prevent Becerra from firing the fatal shot, it does support the conclusion that Delvillar failed to take any action to restrain Rocha from firing a second shot, or otherwise mitigate the escalating danger after the first gunfire. His conduct and inaction contributed to the chain of events that culminated in Jimenez's death.

### 2. Reckless Indifference to Human Life

#### a. Use of or Awareness of the Presence of Weapons and Knowledge of Cohort's Likelihood of Killing

Delvillar was present during the planning of the home invasion, where multiple firearms were distributed and loaded. He therefore knew the offense would be carried out by several armed participants. Even still, that evidence alone is insufficient to conclude that his cohorts were likely to use lethal force against anyone they encountered. Indeed, our Supreme Court has emphasized that the planning of or participation in a felony, even one in which the perpetrators were armed, is not by itself sufficient to show reckless indifference. (*Clark, supra*, 63 Cal.4th at pp. 613–623; *Scoggins, supra*, 9 Cal.5th at p. 682; see *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087–1088 ["Participation 'in a garden-variety armed robbery' where 'death might be possible but not probable' is insufficient[,]" without more, to support a finding of reckless indifference].)

But once Rocha fired his gun inside the residence, any uncertainty about danger posed by the armed group materially changed. From that point forward, Delvillar was on notice that his confederates were prepared to potentially use lethal force to carry out the

home invasion. His continued participation after that escalation weighs in favor of reckless indifference.

### b. *Duration of the Crime*

A "lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence. 'Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant.... Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, "there is a greater window of opportunity for violence" [citation], possibly culminating in murder.' " (*People v. Emanuel* (2025) 17 Cal.5th 867, 886.)

From the record, the events preceding Jimenez's murder unfolded rapidly, and there was a sudden escalation in violence culminating in the murder. There is no evidence that Delvillar had the ability to "say or do something" (*In re McDowell*, *supra*, 55 Cal.App.5th at pp. 1012, 1014) to Becerra.

At the same time, the brevity of the crime does not neutralize the significance of what Delvillar observed. He was present during an armed home invasion, participated in violence against a victim, and remained on scene after Rocha fired inside the residence. Even if the fatal shooting quickly followed, the record supports the conclusion that Delvillar continued his participation despite an obvious risk that the violence could turn deadly. On balance, we conclude this factor is neutral as to a finding of reckless indifference.

### c. *Efforts Taken to Minimize Risk of Violence*

The record demonstrates an absence of any efforts by Delvillar to minimize the risk of violence during the planning stages. (*People v. Emanuel, supra,* 17 Cal.5th at pp. 887–888.) Although Flores testified the participants were instructed to wound rather than kill anyone, and only if necessary, all of the perpetrators were armed, and some were loading their weapons at the kitchen table as the home invasion was being planned.

Given Delvillar's presence during the planning of the home invasion, the record supports a reasonable inference that he was aware the firearms would be loaded and that they may be used.

Moreover, the group intended to carry out a nighttime home invasion of an occupied residence where drug transactions were believed to occur, circumstances under which the potential for a violent confrontation was unmistakable.

Under these circumstances, any purported limitation on the use of lethal force was illusory, and Delvillar's willing participation in the plan, without taking any steps to reduce the risk of violence, supports a finding that he acted with reckless indifference to human life.

### d. Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid the Victims

Presence at the scene is "a particularly important aspect of the reckless indifference inquiry." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 148.)  Delvillar was not merely a lookout during the home invasion, he took an active role in the commission of the crime.  Further, he remained present when Rocha fired the first shot.  At that point, the risk of lethal violence was unmistakable.  This factor weighs in favor of reckless indifference.

### e. Delvillar's Youth at the Time of the Offense and Whether it Diminished his Culpability

In addition to the factors identified in *Clark*, several appellate courts have held that youth is a relevant consideration to whether the defendant acted with reckless indifference to human life.  (*People v. Harris* (2021) 60 Cal.App.5th 939, 960, review granted Apr. 28, 2021 [a defendant's " 'youth at the time of the crime, particularly in light of subsequent case law's recognition of the science relating to adolescent brain development' " can render it " 'far from clear that [he or she] was actually aware "of particular dangers posed by the nature of the crime" ' "]; *In re Moore* (2021) 68

Cal.App.5th 434, 454 [concluding that " 'hallmark features' of youth—'among them, immaturity, impetuosity, and failure to appreciate risks and consequences'—are arguably more germane to a juvenile's mental state than to his or her conduct]; and *People v. Ramirez, supra,* 71 Cal.App.5th 970, 987 [" ' " 'the background and mental and emotional development of a youthful defendant [must] be duly considered' in assessing his culpability" ' "]; *People v. Keel* (2022) 84 Cal.App.5th 546, 558–559 [finding that youth may be an important consideration relevant to whether a defendant acted with reckless indifference to human life].)

We agree that the defendant's age at the time of the offense is relevant to the determination of whether he or she acted with reckless indifference to human life. Here, Delvillar was 18 years old at the time of the home invasion. His youthful age may have made him more vulnerable to external pressures, including the expectation by higher-ranking gang members that he "put in work" for the gang. (Cf. *People v. Jones* (2022) 86 Cal.App.5th 1076, 1092–1093 [expressing doubt that a 20-year-old petitioner who helped plan a crime, grabbed a loaded gun, and then volunteered to aide in its execution, may have acted with less than reckless indifference to human life because of his exposure to violence in adolescence].) This would militate against a finding that he acted with reckless indifference. However, the record is not sufficiently developed to permit us to confidently reach such a conclusion.[9]

Unlike cases involving detailed evidence of trauma and exposure to violence, immaturity, mental health issues, or impulsivity, the record here contains little evidence from which to assess how Delvillar's age affected his judgment. (Cf. *People v. Jones, supra*, 86 Cal.App.5th at p. 1091 [the petitioner presented evidence of his "traumatic and violent" upbringing as well as under-diagnosed mental health and substance abuse

---

[9]     The parties only discussed Delvillar's age and background in the context of his motion for a hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261. The transcript from that hearing is not part of the record.

issues, and "appeared to be impulsive rather than criminally sophisticated"].) As such, there is insufficient evidence from which to conclude Delvillar's age and maturity at the time of the offense lessened his culpability for murder. But even assuming this factor weighs against a finding of reckless indifference, it is not dispositive, particularly in light of the remaining evidence supporting that conclusion.

### C.    Totality of the Circumstances

Based on the totality of the circumstances, we conclude that substantial evidence supports the trial court's determination that Delvillar acted as a major participant who acted with reckless indifference to human life. Delvillar knowingly joined an armed nighttime home invasion of an occupied residence potentially associated with drug activity. He was present during the planning of the offense, knew his confederates would be armed with firearms, and actively participated in the crime. The trial court could reasonably find that he entered the residence and personally engaged in violence by pistol-whipping one of the victims.

He remained present when Rocha fired his gun inside the residence, making the risk of lethal violence unmistakable. Yet, rather than restraining his accomplices or deescalating the situation, he continued his participation.

Although the record does not establish that he could have prevented Becerra from firing the fatal shot, his continued involvement after the initial gunfire, coupled with his failure to take any steps to minimize the escalating danger, supports the conclusion that he both played a substantial role in the offense and consciously disregarded a grave risk to human life.

**DISPOSITION**

The trial court's order denying Delvillar's petition for resentencing is affirmed.

35.

                                                                FRANSON, J.

WE CONCUR:


HILL, P. J.


LEVY, J.